STATE of Missouri, ex rel. Jeremiah
W. (Jay) NIXON, Attorney
General, Respondent,

v.

AMERICAN TOBACCO COMPANY,
INC., et al., Respondents,

and

The City of St. Louis, et al., Proposed
Intervenors/Appellants.

State Senator Peter Kinder and Rickey
Jamerson, Appellants,

v.

Jeremiah W. (Jay) Nixon, Attorney
General, and Thomas Strong,
Respondents.

Nos. SC 82392, SC 82898.

Supreme Court of Missouri,
En Banc.

Dec. 12, 2000.

Rehearing Denied Jan. 23, 2001.

Kenneth Brostron, Margaret M. Monney, Terrance J. Good, Carolyn M. Kopsky, Lashley and Baer, St. Louis, W. Bevis Schock, St. Louis, Larry D. Coleman, Kansas City, Derald L. Gab, Bruce Bealke, Hugh E. McNeely, Derald L. Gab, P.C., St. Louis, for Proposed Intervenors/Appellants.

Jeremiah W. (Jay) Nixon, Atty. Gen., Paul C. Wilson, Asst. Atty. Gen., Jefferson City, Thomas G. Strong, Special Asst. Atty. Gen., The Strong Law Firm, P.C., Springfield, Edward D. Robertson, Jr., Bartimus, Frickleton and Presley, P.C., Jefferson City, J. William Newbold, Bruce D. Ryder, Richard P. Cassetta, Thompson Coburn, L.L.P., St. Louis, Thomas F. Gardner, Jones, Day, Reavis and Pogue, Chicago, IL, Robert McDermott, Paul S. Ryerson, Jones, Day, Reavis and Pogue, Washington, DC, Alan Kohn, Lisa A. Pake, Kohn, Shands, Elbert, Gianoulakis & Giljum, St. Louis, Dan K. Webb, Winston and Strawn, Chicago, IL, Frank N. Gundlach, Armstrong, Teasdale, P.C., St. Louis, Andrew McGaan, Pam Padmanabhan, Kenneth N. Bass, Kirkland and Ellis, Chicago, IL, John Nyhan, Chadbourne and Parke, LLP, New York, Arthur L. Smith, Husch and Eppenberger, St. Louis, Adam Stein, Simpson, Thacher and Bartlett, New York, Steven Klugman, Debevoise and Plimpton, New York, Kenneth Mallin, Bryan Cave L.L.P., St. Louis, Rodney Ott, Bryan Cave L.L.P., Phoenix, AZ, Michael C. Lasky, Davis and Gilbert L.L.P., New York, Robert Hoemeke, Michael Casey, Lewis, Rice and Fingersh, St. Louis, Larry E. Hepler, Theodore MacDonald, Amy K. Collignon, Burroughs, Hepler, Broom, MacDonald &

Hebrank, Edwardsville, IL, Richard E. Boyle, Gundlach, Lee, Eggman, Boyle and Roessler, Belleville, IL, Gene Voigts, Shook, Hardy and Bacon, L.L.P., Kansas City, Charles Joley, Donavan, Rose, Nester, Szewczyk & Joley, P.C., Belleville, IL, Michael Fay, Kaskowitz, Benson, Torres and Friedman, L.L.P., New York, for Respondents in No. SC 82392.

James P. Holloran, St. Louis, Amicus Curiae, The Missouri Coalition on Smoking or Health.

W. Bevis Schock, St. Louis, for Appellants in No. SC 82898.

Jeremiah W. (Jay) Nixon, Atty. Gen., Paul C. Wilson, Asst. Atty. Gen., Jefferson City, for Respondents in No. SC 82898.

WHITE, Judge.

## I.

These cases arise from various issues surrounding the settlement between the State of Missouri and various tobacco interests. Because the cases present similar legal issues, we consolidate the cases for purposes of opinion.

On May 12, 1997, the State of Missouri filed suit against several manufacturers of tobacco products seeking to obtain damages, restitution, civil penalties, punitive damages, declaratory and injunctive relief, and various other forms of relief in connection with the tobacco defendants' marketing and sales of products in Missouri.

On June 29, 1998, Attorney General Nixon entered into a contract for legal services with attorney Thomas Strong. The contract appointed Strong as "Lead Special Assistant Attorney General" solely for purposes of the tobacco litigation. Under the terms of the contract, Strong was required to provide all necessary financial and personnel resources that may be needed to bring the case to trial. No reimbursement was due Strong for expenses

and costs beyond the compensation amounts provided under the contract.[1]

On August 5, 1998, State Senator Peter Kinder and Mr. Rickey Jamerson filed a separate action against Attorney General Nixon and Strong in Cole County Circuit Court asserting standing as taxpayers. In their first amended petition, they alleged: (1) the compensation provisions of the fee contract were unlawful to the extent they require the State to pay funds not appropriated by the legislature; (2) that the hourly fee provisions lack mutuality and, therefore, are void and unenforceable; (3) the contingent fee provisions under the contract violate section 105.452[2] and, therefore, are unlawful; and (4) the payment of legal fees would constitute payment from funds at stake and would be unlawful. The petition sought both injunctive relief and a declaratory judgment that the contract was void. Upon dual motions for judgment on the pleadings, the trial court denied Kinder's and Jamerson's motion and granted Respondents' motion.

On October 2, 1998, several political subdivisions and not-for-profit agencies filed a motion to intervene in the original action in the Circuit Court of the City of St. Louis as a matter of right under Rule 52.12(a) or, in the alternative, seeking discretionary intervention under Rule 52.12(b). They sought actual damages for recovery of past and future unreimbursed costs resulting from care of indigent and Medicaid patients suffering from tobacco-related illnesses as well as punitive damages. The motion court found that the political subdivisions and agencies did not have a sufficient interest for intervention.

On November 23, 1998, Attorney General Nixon signed the Master Settlement Agreement (MSA) which resolved the dispute between the State of Missouri and the tobacco defendants. In addition to annual payments which may total some $6.7 billion over a 25–year period, the tobacco defendants are enjoined from utilizing some marketing methods that target minors and face restrictions regarding advertisement and sponsorship of sporting events, concerts and similar activities. They further agreed to quit advertising on traditional outdoor and transit billboards and refrain from distributing merchandise with their logos.

At various times after execution of the MSA, various parties sought intervention in the Circuit Court of the City of St. Louis, arguing that the settlement would release or impair their individual lawsuits against the tobacco defendants. The trial court denied all of the motions to intervene and entered a consent decree and judgment.

## II.

■ The proposed intervenors appeal the trial court's denial of their respective motions to intervene. Denial of a motion for leave to intervene as a matter of right under Rule 52.12 will be affirmed by an appellate court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law.[3]

---

1. The contract provided alternative provisions for Strong's compensation. (1) If settlement or judgment favorable to the State occurred on or before January 1, 1999, the special attorneys general could be paid on an hourly basis. (2) If settlement or judgment favorable to the State occurred between January 1, 1999 and January 1, 2000, the special attorneys general would receive a fee equal to 6.15% of the settlement or judgment. (3) If the settlement or judgment favorable to the State occurred later than January 1, 2000, the special attorneys general were to receive a fee equal to 7.15% of the total settlement or judg-

ment. The agreement also provided for reimbursement of costs and expenses, but no fees were due unless a settlement or favorable verdict to the State was entered.

2. All statutory references are to RSMo 1994, unless otherwise indicated.

3. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Long v. Seely*, 975 S.W.2d 208, 210 (Mo.App.1998); *Borgard v. Integrated Nat'l. Life Ins. Co.*, 954 S.W.2d 532, 535 (Mo. App.1997).

■ Rule 52.12(a) governs intervention of right and provides:

(a) **Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of this state confers an unconditional right to intervene or (2) when the applicant claims an interest relating to the property or transaction that is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

In the absence of a statute conferring an unconditional right of intervention, an applicant seeking intervention must file a timely motion and "show three elements: (1) an interest relating to the property or transaction which is the subject of the action; (2) that the applicant's ability to protect the interest is impaired or impeded; and (3) that the existing parties are inadequately representing the applicant's interest." [4] The proposed intervenor carries the burden of establishing the presence of all three elements required for intervention as a matter of right.[5] When an applicant satisfies these elements, however, the right to intervene is absolute and the motion to intervene may not be denied.[6]

### a) City of St. Louis

■ The City of St. Louis and Alexian Brothers Hospital (the City) claims the trial court erred when it denied its motion for intervention as a matter of right because it determined the City's "interests and rights were not prejudiced by the [MSA] ... except to the extent the State has power, by contract, statute, or otherwise to bind the proposed intervenors." The City claims that it possesses at least three interests that are directly affected by the MSA and the consent decree. First, it claims an interest in recovering money it spent for tobacco-related health care costs. Second, it claims an interest in the MSA and consent decree to the extent the approval of those agreements may release the City's claims against the tobacco defendants. Finally, the City claims an interest in the State's settlement proceeds if the attorney general has released its claims.

The City's claim for intervention is quite different from other intervenors in this case, given its position as a political subdivision. The State submits that either (1) the City's interest is consumed by the MSA pursuant to the attorney general's authority to conduct litigation on behalf of the State, or (2) if the State does not possess the power to enter into a settlement that binds its political subdivisions, then the City's ability to sue the tobacco manufacturers independently is not impeded.

The MSA describes those parties bound by its terms as follows:

(pp) "Releasing Parties" means each Settling State and any of its past, present and future agents, officials acting in their official capacities, legal representatives, agencies, departments, commissions and divisions; and also means, to the full extent of the power of the signatories hereto to release past, present, and future claims, the following: ... (2) persons or entities acting in parens patriae, sovereign, quasi-sovereign, private attorney-general, qui tam, taxpayer, or any other capacity whether or not any of them participate in this settlement, (A) to the extent that any such person or entity is seeking relief on behalf of or generally applicable to the general public in such Settling State or the people of

---

4. *Timmermann v. Timmermann*, 891 S.W.2d 540, 542 (Mo.App.1995).

5. *Augspurger v. MFA Oil Co.*, 940 S.W.2d 934, 937 (Mo.App.1997).

6. *Borgard*, 954 S.W.2d at 535 (citing *Whitehead v. Lakeside Hosp. Ass'n*, 844 S.W.2d 475, 478–79 (Mo.App.1992)).

the State, as opposed solely to private or individual relief for separate and distinct injuries, or (B) to the extent that any such entity (as opposed to an individual) is seeking recovery of health care expenses (other than premium or capitation payments for the benefit of present or retired state employees) paid or reimbursed, directly or indirectly, by a Settling State.

Section XII(b) of the MSA further states:

If a Releasing Party (or any person or entity enumerated in subsection II(pp), without regard to the power of the attorney general to release claims of such person or entity) nonetheless attempts to maintain a Released Claim against a Released party ... The Released Party may offer the release and covenant as a complete defense.

The attorney general's claim that the City's interest is consumed by the settlement relies upon section 27.060, which grants the attorney general power to control and manage litigation for the State, and upon his broad common-law powers to manage the State's litigation and enter into settlements on behalf of the State.[7] The attorney general contends that he is empowered to enter into a settlement for all citizens of the State, including those who reside in the City of St. Louis.

■ The issue boils down to the question of whether the City's interest in pursuing claims against the tobacco defendants may be impaired or impeded by this settlement with the State. To say that the attorney general is empowered to enter settlements for the citizens of Missouri generally, including those who reside in the City of St. Louis, does not, however, answer the question of whether he has the power to compromise or extinguish a claim

that is held by the City. The City of St. Louis has the power to litigate claims in its own right where its own financial interests have been affected,[8] and we can find no statutory or constitutional provision that allows the attorney general to control or compromise the City's claims.

The issue of whether the City has a claim against the tobacco defendants is not before us in this appeal. But we do note that the MSA does allow the tobacco defendants to assert the settlement as an affirmative defense to a claim by the City, to the extent that the attorney general has the power to compromise the City's purported or potential claim. This provision, the City argues, means that the MSA may as a practical matter impair or impede the City's ability to prosecute its claim, and thus the City has a right to intervene.

■ An interest necessary for intervention as a matter of right does not include a mere, consequential, remote or conjectural possibility of being affected as a result of the action, but must be a direct claim upon the subject matter such that the intervenor will either gain or lose by direct operation of judgment.[9] A declaratory judgment is not available to adjudicate hypothetical or speculative situations which may never come to pass.[10] To be ripe for declaratory judgment, a justiciable controversy must exist.[11]

In the circumstances of this case, the City's motion to intervene lacks a showing that the City's interests in the future may be impaired or impeded by this settlement to support intervention as a matter of right because the attorney general does not have the power to extinguish the City's claim by this settlement. Accordingly, the trial court's denial of the City's motion to intervene is affirmed.

---

7. 7A C.J.S. *attorney general* section 12 (1980).

8. *See* St. Louis Rev. Charter Art. I, sec. 1.

9. *Matter of Estate of Potashnick,* 841 S.W.2d 714, 719 (Mo.App.1992).

10. *Farm Bureau Town and Country Ins. Co. v. Angoff,* 909 S.W.2d 348, 352 (Mo. banc 1995).

11. *Id.*

## b) Margie Coleman [12]

On December 28, 1998, proposed intervenor Margie Coleman (Coleman) filed a motion for leave to intervene and a petition in intervention. Margie Coleman is the surviving spouse of Elvis Coleman, who died of complications associated with tobacco-related illness and disease. Coleman sought to intervene in this case on the basis that the MSA would preclude her action against the tobacco defendants for the wrongful death of her husband. On March 26, 1999, the trial court issued its order and judgment denying Coleman's motion for leave to intervene, finding that Coleman had failed to establish that the MSA would impair or impede her individual cause of action.

■ Coleman contends she is entitled to intervene in this suit pursuant to Rule 52.12(a)(1) because "a statute of this state confers an unconditional right to intervene." Coleman avers that section 537.080, the wrongful death statute, confers such a right. She relies on language of subdivision (2), which provides that only one action may be brought against any one defendant for the death of one person.

■ Coleman raises this issue for the first time on appeal. Nowhere in her motion to intervene did she argue an unconditional right to intervene based on the wrongful death statute. An issue that was never presented to or decided by the trial court is not preserved for appellate review.[13] In any event, the wrongful death statute does not provide her with an unconditional right to intervene. The State never asserted a cause of action against the tobacco defendants for wrongful death; thus, section 537.080 does not apply.

In addition, Coleman argues she is entitled to intervene under Rule 52.12(a)(2). We agree with the trial court that she is not entitled to intervene because nothing in the MSA would impair or impede her individual cause of action. The MSA, in the section entitled "Releasing Parties," describes in detail the various parties to which the MSA applies and expressly excludes "[those parties seeking] individual relief for separate and distinct injuries...." The MSA does not purport to settle any individual claims against the tobacco defendants and by its terms excludes the release of private causes of action against the tobacco defendants from its scope. The MSA states that it does not have any effect on the rights of individuals seeking "private or individual relief for the separate and distinct injuries" such as Coleman. Thus, Coleman is not precluded from bringing her action by the MSA. Accordingly, Coleman's ability to protect her interest in her wrongful death action has not been impaired or impeded; thus she fails to satisfy the second requisite element to intervene as of right. The trial court did not err in denying Coleman's Motion for Leave to Intervene.

## c) Helen Cheeks and Terry Gatlin

On December 18, 1998, intervenors Cheeks and Gatlin (Consumers) filed a motion to intervene as a matter of right pursuant to Rule 52.12(a) or, in the alternative, for permissive intervention pursuant to Rule 52.12(b). They simultaneously filed a petition demanding restitution, appointment of a receiver, and a motion to certify a class action under Rule 52.09. Their motion for intervention maintained that they should be permitted to intervene because the attorney general had originally sued the tobacco defendants under the Missouri Merchandising Practices Act (MMPA) [14] and had made a claim for restitution on behalf of Missouri consumers under the MMPA. Consumers contend that they will not receive any funds under

---

12. With regard to Ms. Coleman's claim for intervention, this Court adopts relevant portions of the opinion of the court of appeals authored by the Honorable James R. Dowd.

13. *Zundel v. Bommarito,* 778 S.W.2d 954, 957 (Mo.App.1989).

14. Sections 407.010 to 407.307.

the settlement reached by the tobacco defendants and the attorney general unless the trial court permits their intervention.

The trial court dismissed Consumers' motions for intervention, their motion to certify a class, and their petition for appointment of a receiver, concluding that Consumers had failed to establish that their ability to bring a separate action had been impaired.

■ In their first claim of error, Consumers argue the trial court erred when it denied their motion for intervention as a matter of right under Rule 52.12(a). Addressing the requirements of Rule 52.12(a) as discussed in *Timmermann*,[15] Consumers first claim that they possess an interest in the subject matter of the action between the State and the tobacco defendants. Citing *Augspurger v.. MFA Oil Company*[16] for the proposition that an interest supporting intervention has its origin "in the demand made or proceeds sought or prayed by one of the parties to the original action,"[17] Consumers contend that the source of their interest requiring intervention in the present case stems from the State's claim for restitution pursuant to section 407.100. Consumers claim that their interest is sufficient to meet the first prong of the intervention test because they and all other Missouri tobacco consumers stand to gain should the State obtain injunctive and restitution relief under the MMPA. Consumers further assert that should the MSA be approved, they will be forever denied an opportunity to collect damages unless the court orders restitution.

■ Consumers misunderstand the nature of a section 407.100 action. By the terms of the statute, it is entirely within the discretion of the attorney general whether to seek injunctive relief or restitution on behalf of the citizens of Missouri. Consumers claim that the State's inclusion of a claim for relief in its second amended petition binds the attorney general to demand restitution or somehow otherwise invokes their right to receive such restitution. This argument is without support. In this case, the parties to the litigation entered into a settlement that did not reach the MMPA claims whatsoever. Section 407.100 provides:

> The court, in its discretion, may enter an order of restitution, payable to the State, as may be necessary to restore to any person who has suffered any ascertainable loss ... which may have been acquired by means of any method, act, use, practice or solicitation, or any combination thereof, declared to be unlawful by this chapter. .

Absent a finding or admission of a violation of the MMPA, the trial court was without jurisdiction to order restitution from the settlement funds. Consumers lack any interest in the settlement sufficient to justify intervention under Rule 52.12(a).

Consumers further claim they are situated such that disposition of the matter between the tobacco defendants and the State impairs or impedes their ability to protect their interests. They assert that the MSA's failure to provide any avenue for consumer restitution, as was originally contained in the State's prayer for relief, extinguished their interest in obtaining a court-ordered restitution in accordance with the section 407.100. As previously discussed, Consumers have no interest in obtaining restitution under section 407.100. Instead, they may protect their interest by bringing a private action pursuant to section 407.025. Section 407.025.1 permits "any person" who purchases goods for personal or family use and who "suffers an ascertainable loss of money or property ... as a result of the use ... by another person of a method, act or practice declared unlawful by section 407.020, ... [to]

**15.** 891 S.W.2d at 542.

**16.** 940 S.W.2d 934 (Mo.App.1997).

**17.** *Id.* at 937.

bring a private civil action ... to recover damages...."

Consumers next contend their claims will be impeded under the MSA because it permits tobacco defendants to claim a credit for amounts paid under the MSA against any judgment rendered against the tobacco defendants in a section 407.025 proceeding. This is not the case. Section XII(b) of the MSA permits the tobacco defendants to seek offsets in the event that a "Releasing Party (or any person or entity enumerated in subsection II(pp), without regard to the power of the attorney general to release claims of such person or entity) nonetheless attempts to maintain a Released Claim against a Released Party...." By the terms of the MSA, an offset only occurs when a "Releasing Party" files a "Released Claim" against a "Released Party." Because Consumers would be seeking *individual relief for separate and distinct injuries,* an exception explicitly provided in the MSA, there would be no offset. Furthermore, even if the tobacco defendants were entitled to a credit under the terms of the MSA, the credit would be taken from the amounts to be paid to the State, not from Consumers.

■ Finally, Consumers contend that the trial court erred when it denied their motion for permissive intervention. We limit our review of the trial court's decision to abuse of discretion.[18] "Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable people can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion."[19] Given the availability of alternative relief and the possibility of undue delay and prejudice to the original parties in the action, we cannot find that the deni-

al was so unreasonable as to require permissive intervention.

### d) Sherry Neel

■ Sherry Neel filed a motion to intervene in this case as a matter of right pursuant to Rule 52.12(a) or, in the alternative, for discretionary intervention under Rule 52.12(b). She claims, as a taxpayer and a smoker, that she has an interest in the settlement and her interests, along with those of other taxpayers, will be lost unless she is permitted to intervene. Neel also claims that those portions of the MSA that address the legal fees due the assistant attorneys general violate the Missouri Constitution.

The trial court denied Neel's motion to intervene, holding that Neel had no interest in the State's lawsuit. We elect not to address that question. To the extent that Neel has any interest in the settlement, however, that interest is clearly neither impaired nor impeded. As demonstrated by *Kinder and Jamerson v. Nixon and Strong*—the very case we have consolidated for consideration here—Neel could file a separate lawsuit to address her allegations. As Neel "would not be bound by any possible judgment in [the] case ... as that case now stands," her interests are neither impaired nor impeded for the purposes of Rule 52.12(a).

Accordingly, we affirm the trial court's denial of intervention for all proposed intervenors.

### III.

### The Attorneys' Fee Agreements

### a) Justiciability

■ Attorney General Nixon and Strong (Respondents) initially challenge State Senator Kinder's and Mr. Jamerson's (Appellants) petition claiming that

---

18. *Meyer v. Meyer,* 842 S.W.2d 184, 188 (Mo. App.1992).

19. *Richardson v. State Highway & Transp. Comm'n.,* 863 S.W.2d 876, 881 (Mo. banc 1993).

they lack sufficient standing to bring an action against the contract between Attorney General Nixon and Strong. Justiciability is a necessary element of a declaratory judgment action.[20] Standing is an element of justiciability.[21] A party who lacks standing may not seek a declaratory judgment action.[22] Respondents claim that Appellants have no personal interest in the contract and, therefore, lack standing. Respondents note that Appellants' claim was brought under section 527.020, which states:

> Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder.

Appellants claim standing based upon circumvention of the constitutionally required legislative appropriations process and provisions for illegal payments of public funds. In their brief, they "suggest that as taxpayers, they will suffer a 'pecuniary loss attributable to the challenged transaction if these payments are made'" and that "[t]heir loss consists of their representative portions, as citizens, of the amounts paid."

Respondents point out that while Missouri courts have not precisely defined the outer limits of standing necessary to bring suit to construe a contract under section 527.020, the court of appeals in *Hardware Center, Inc. v. Parkedge Corp.*[23] noted that no Missouri case has granted standing to a

person not entitled to enforce the contract for the purpose of seeking a declaration of rights under it.[24] Respondents contend that Appellants have no right to enforce the contract and, therefore, lack standing to bring a declaratory judgment action regarding its terms. They further argue that even if taxpayer standing is available for declaratory judgments, Appellants have failed to meet that standard.

In *Eastern Missouri Laborer's District Council v. St. Louis County,*[25] this Court held that in order to have standing, a taxpayer must demonstrate either: (1) a direct expenditure of funds generated through taxation, (2) an increased levy in taxes, or (3) a pecuniary loss attributable to the challenged transaction of a municipality. Respondents first contend that even if a direct expenditure of funds generated from taxation was required, then those funds must be appropriated by the legislature and would render Appellants' argument that the payment is unlawful moot. Furthermore, Respondents note that Appellants have not alleged that the MSA will result in any increased tax levy, nor have they shown that either they or the State will suffer any pecuniary loss by virtue of the contract.

Despite Respondents' contentions, we find that Appellants' petition makes sufficient allegations to support standing to challenge the legality of the fee contract.

> The primary basis for taxpayer suits arises from the need to insure that government officials conform to the law. It rests upon the indispensable need to keep public corporations, their officers, agents and servants strictly within the limits of their obligations and faithful to

---

**20.** *Witty v. State Farm Mutual Automobile Ins. Co.,* 854 S.W.2d 836, 838 (Mo.App.1993).

**21.** *See* Black's Law Dictionary 1405 (6th ed.1990).

**22.** *Missouri Dept. of Social Services v. Agi–Bloomfield Convalescent Center, Inc.,* 682 S.W.2d 166, 168 (Mo.App.1984) (holding that

facts must be alleged showing that parties seeking declaratory relief have a legally protectable interest at stake).

**23.** 618 S.W.2d 689 (Mo.App.1981).

**24.** *Id.* at 694.

**25.** 781 S.W.2d 43 (Mo. banc 1989).

the service of the citizens and the taxpayers. . . .

Public policy demands a system of checks and balances whereby taxpayers can hold public officials accountable for their acts. Even though an expenditure might produce a net gain, if the expenditure is not contemplated by the enabling legislation, it is illegal and should be enjoined. Taxpayers must have some mechanism of enforcing the law.[26]

Respondents do not contest that Appellants are Missouri taxpayers. In *Eastern Missouri Laborers*, this Court noted its decision in *Tichenor v. Missouri State Lottery Commission*,[27] which permitted taxpayer standing to challenge expenditures by the State lottery commission, notwithstanding that the lottery would result in a net gain for the State.[28] Standing was similarly found in *Berghorn v. Reorganized School Dist. No. 8*,[29] a case where taxpayers challenged an expenditure of public funds for parochial schools, despite the fact that no private pecuniary loss had been alleged.

■ Respondents next assert that Appellants' claims before this Court are not ripe for review. They note that under the terms of the contract between Strong and Attorney General Nixon, no fee payment could ever be due to Strong from the state treasury before October 2001. They further claim that it is highly unlikely that Strong will ever be paid a fee drawn upon the state treasury, given both the likely approval of the MSA and their entry into the Missouri Fee Payment Agreement (MFPA). Under this agreement, the tobacco defendants agree to pay all reasonable expenses for services rendered by Strong in connection with his representation of the State in this case.

Similarly, Respondents suggest that their entry into the MFPA renders Appellants' concerns moot. The MFPA provides that, in exchange for a release by Strong of whatever claims he may have against the tobacco defendants, the tobacco defendants will pay a reasonable fee for all services Strong rendered in connection with this case. Upon signing the MFPA, Strong executed a full and complete release of all obligations the State may owe him arising out of the fee contract, to become effective upon the payment of Strong's fees by the tobacco defendants. Accordingly, Respondents submit that Appellants' claims regarding the fee contract are rendered moot by the release, as any fee collected by Strong pursuant to the MSA would not originate from the state treasury.

We find Respondents' argument regarding justiciability unconvincing. First, we note that "Final Approval" as defined in the release has not occurred and the release is not effective to relieve the State of potential liability under the Contract Agreement for Legal Services. Furthermore, we find Respondents' argument unpersuasive, as it relies on an elusive shell game that misdirects the nature of the attorney fees. While it is true that these funds do not originate in the state treasury, our analysis does not end there. Instead, we look to the method by which parties settle disputes. When considering whether to make an offer to settle, a litigant establishes a monetary amount that reflects, among numerous other factors, both his potential loss should he continue litigation and the risk that he may not succeed on the merits. This adjusted figure represents that litigant's maximum settlement price. Once the litigant has negotiated a settlement amount he finds favorable, it is of absolutely no consequence to him how the settlement is divided among various parties.

26. *Id.* at 46–47.

27. 742 S.W.2d 170 (Mo. banc 1988).

28. *Id.* at 46 (citing *Tichenor v. Missouri State Lottery Commission*, 742 S.W.2d 170, 172 (Mo. banc 1988)).

29. 364 Mo. 121, 260 S.W.2d 573, 581 (1953).

In this case, the attorney general and Strong have entered into a settlement with the tobacco defendants that bifurcates the attorneys fees to be paid Strong from the negotiated settlement to be received by the State of Missouri. While we do not find this arrangement to be improper *per se*, we view with suspicion Respondents' contention that these attorneys fees are not state funds for purposes of justiciability. We find that to characterize these funds as wholly private funds places form before substance, as it is these parties that negotiated the funds in this manner. The entire purpose of Appellants' challenge to this transaction is to show that this arrangement places form before substance and amounts to an improper payment of state funds. For purposes of justiciability, it suffices to point out that the tobacco companies would owe Strong nothing if he were not representing the State of Missouri, and, if there is a claim for attorneys' fees from these tobacco defendants, the claim exists because of the underlying claims of the State of Missouri as to the merits of the controversy between the State and the tobacco defendants. For this reason, justiciability is established and we address the merits.

### b) Standard of Review

On appeal from the trial court's grant of Respondents' motion for judgment on the pleadings, we review the allegations of Appellants' petition to determine whether the facts pleaded therein are insufficient as a matter of law. "The party moving for judgment on the pleadings admits, for purposes of the motion, the truth of all well pleaded facts in the opposing party's pleadings."[30] "The position of a party moving for judgment on the pleadings is similar to that of a movant on a motion to dismiss; i.e., assuming the facts pleaded by the opposite party to be true, these facts are, nevertheless, insufficient as a matter of law."[31] A trial court properly grants a motion for judgment on the pleadings if, from the face of the pleadings, the moving party is entitled to a judgment as a matter of law.[32]

### IV.

In their first point, Appellants suggest that the trial court erred in its determination that the MSA does not require any payments from the State, but calls for a system of payments to be paid directly from the tobacco defendants to Strong. Article IV, section 28 of the Missouri Constitution states:

No money shall be withdrawn from the state treasury except by warrant drawn in accordance with an appropriation made by law, nor shall any obligation for that payment of money be incurred unless the commissioner of administration certifies it for payment and certifies that the expenditure is within the purpose as directed by the general assembly of the appropriation and that there is in the appropriation an unencumbered balance sufficient to pay it.

Appellants engage in substantial analysis to make the suggestion that the provisions for attorney compensation amount to a clever scheme that raises form over substance allowing the tobacco defendants, a party-opponent to the underlying litigation, to pay the fees owed to Strong and the special assistants. Appellants rely on the notion that a party seeking settlement of an action against it has a certain sum of funds it is willing to expend in order to settle the case. It is of no consequence to the settling party to whom the funds finally get paid. Thus, it would seem unusual

**30.** *Barker v. Danner,* 903 S.W.2d 950, 957 (Mo.App.1995) (quoting *Angelo v. City of Hazelwood,* 810 S.W.2d 706, 707 (Mo.App. 1991)).

**31.** *Madison Block Pharmacy v. U.S. Fidelity,* 620 S.W.2d 343, 345 (Mo. banc 1981) (quoting *Cantor v. Union Mutual Life Insurance Company,* 547 S.W.2d 220, 224 (Mo.App. 1977)).

**32.** *Madison Block,* 620 S.W.2d at 345.

that the settling party has set aside a certain sum of money for settlement of the case and set aside an entirely separate sum of money to directly pay the attorneys of its opponent. For certain, this payment arrangement is peculiar to the normal method where the attorney collects the entire settlement sum, distributes the client's award, and retains his fees only after approval from the client.

While the payment provisions to Strong and the special assistants in this case are atypical, they are not necessarily improper. Rule 4–1.8, which follows the similarly numbered Model Rules of Professional Conduct, provides for the handling of conflicts of interests by lawyers. Subsection (f) of the rule provides:

A lawyer shall not accept compensation for representing a client from one other than the client unless:

(1) the client consents after consultation

(2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

(3) information relating to representation of a client is protected as required by Rule 1.6.

Similarly, the comments following Rule 4–1.7 with regard to the interest of a person paying for a lawyer's service provide:

A lawyer may be paid from a source other than the client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty to the client.

There is a potential danger in an agreement where a plaintiff's attorney's fee is to be paid by defendants. The danger is that the lawyer's own interest will prevail over the client's—or to put it another way, that the lawyer might be unduly influenced by an oversized fee to recommend an inadequate settlement for the client. The safe-

guard against this potential danger is the requirement that the client consent to the arrangement. This consent safeguard gives the client the opportunity to determine for itself whether the lawyer is serving the client's best interests. So long as the client, the State of Missouri, is informed of the fee arrangement between tobacco defendants and Strong, consents to the arrangement, and the arrangement does not compromise the lawyer's duty of loyalty to the State, the fee arrangement is permissible.

 The remaining question is who speaks for the State of Missouri to provide the consent necessary to complete the transaction. As noted by Respondents, it is the role of the attorney general to protect the public interest.

If there were no other remedy for a great wrong, and public justice and individual rights were likely to suffer for want of a prosecutor capable of pursuing the wrongdoer and redressing the wrong, the courts would struggle hard to find authority for the attorney general to intervene in the name of the people.[33]

In his role as attorney for the State, the attorney general represents the State of Missouri and its citizens for the purposes of this settlement. The settlement reached by the attorney general and the tobacco defendants was made on behalf of Missouri citizens. The State of Missouri and its citizens are the attorney general's clients and, through their duly elected representatives in the General Assembly, they may control the payment arrangement provided in the MSA, regardless of whether the funds come from the state treasury.[34]

 The plain language of Rule 4–1.8 requires lawyers to seek consent from

**33.** *State ex rel. McKittrick v. Missouri Public Service Comm'n,* 352 Mo. 29, 175 S.W.2d 857, 864–65 (1943).

**34.** *See Three Rivers Junior College Dist. of Poplar Bluff v. Statler,* 421 S.W.2d 235, 238 (Mo. banc 1967) (noting that the General Assembly is vested in its representative capacity with all the primary power of the people).

their clients prior to entering into this type of payment arrangement. Requiring the attorney general to seek similar approval from the legislature every time consent from a client is required would be unduly onerous and would ignore the broad common law powers of his position. The attorney general of Missouri is the only constitutional officer whose powers and duties are not specifically provided for or limited by the constitution. The 1945 Constitution states: "In addition to the governor and lieutenant governor there shall be . . . [an] attorney general. . . ." [35] The absence of a provision for specific powers for the attorney general in our constitution vests the office with all of the powers of the attorney general at common law.

> [W]e have long had a statute [now section 1.010, RSMo.1994] adopting the common law of England and all statutes and acts of Parliament made prior to the fourth year of the reign of James the First, which are of a general nature, not local to that kingdom, and not repugnant to or inconsistent with the Constitution of the United States and the Constitution and statutes of this State in force for the time being. This section evidently has been construed as adopting not only the common-law rights and remedies of litigants, but also such common-law powers of public officers as were possessed by similar officers in England—either that, or else we view the English common law, statutes and history as aids to interpretation. *For it has been held in a majority of the States, including Missouri, that the attorney general does have common-law powers.*[36] (Emphasis added.)

While the attorney general's authority is broad, it is not without limit. As with other common-law precepts, the attorney general's authority can be restricted by a statute enacted specifically for the purpose of limiting his power.

> It is generally held in this country that the office of attorney general is clothed, in addition to the duties expressly defined by statute, with all the powers pertaining thereto under the common law. 'A grant by statute of the same or other powers does not operate to deprive him of those belonging to the office under the common law, unless the statute, either expressly or by reasonable intendment, forbids the exercise of powers not thus expressly conferred.' 6 C.J. 816. This view has been tacitly accepted, and acted upon, in this state for many years. (citations omitted.) [37]

■■■■ The statute that allows for the attorney general to hire assistants and to pay them from appropriations[38] does not prohibit the attorney general in the exercise of his common law power from entering into contingency fee arrangements or agreements that otherwise provide for civil defendants sued by the State to pay attorney fees directly to the State's outside counsel. In the absence of a statute to the contrary, we conclude that the attorney general does have the power to enter into this type of fee arrangement with his special assistant attorneys general. But in this case, which involves payment of the state's attorney fees by the defendants and which is thus subject to the consent requirement of Rule 4–1.8(f), the General Assembly can revoke that power and withhold its consent as the client by enacting legislation that forbids the attorney general from entering into the fee arrangement or otherwise provide an alternative mechanism for compensating the special assistant attorneys general.

## V.

In their second point before this Court, Appellants Kinder and Jamerson contend

---

**35.** Mo. Const. art. IV, sec. 12.

**36.** *McKittrick,* 175 S.W.2d at 861.

**37.** *State ex rel. Barrett v. Boeckeler Lumber Co.,* 302 Mo. 187, 257 S.W. 453, 456 (1924).

**38.** Section 27.020, RSMo.1994.

the attorney general's contract with his special assistant attorneys general improperly pays the special assistants out of the funds at stake in the litigation. In support of this argument, Appellants rely principally on *Thatcher v. City of St. Louis.*[39] In *Thatcher*, a decedent created a charitable trust under the terms of his will. Upon learning of the trust, a number of his descendents brought suit to terminate the trust alleging "the purpose of said trust had long since wholly failed." The attorney general became involved to represent the public in the litigation, electing to retain outside counsel to work on the case. Upon a successful defense of the case, the trial court directed that the charitable trust reimburse the special assistant attorney general from the corpus of the trust.

On appeal, this Court reversed the trial court's decision, relying exclusively on cases involving charitable trust litigation. The Court noted that it was able to find only one case, from the Supreme Court of Oregon, *Wemme v. First Church of Christ, Scientist*, addressing whether special assistant attorneys general may receive compensation for their services from the *res* of a charitable trust.[40] Following the analysis in *Wemme*, this Court held, "neither the attorney general nor special attorneys employed to represent him are entitled to have fees allowed and paid out of the funds of a charitable trust."[41] As the instant case involves an action to recover damages incurred by the State, *Thatcher* does not apply.

### VI.

In their third point, Appellants suggest the trial court erred when it granted Respondents' motion to dismiss the petition with prejudice after having ruled on the merits of the case. The final paragraph of the trial court's order reads:

> For the foregoing reasons, it is hereby ORDERED and ADJUDGED that plaintiff's motion for judgment on the pleadings is denied in its entirety and as to both of plaintiffs' counts, defendants' motion for judgment on the pleadings is granted, and plaintiffs' petition is dismissed in its entirety and with prejudice.

Despite Appellants' contention that the judgment is inconsistent, it is clear that the trial court granted Respondents' motion for judgment on the pleadings and denied Appellants' motion. The remaining language regarding dismissal of plaintiffs' petition with prejudice is mere surplusage and is disregarded.[42]

### VII.

In their final point on appeal, Appellants contend that the trial court erred when it failed to award them attorney fees. They contend while the trial court's determination with regard to their attorney fees is consistent with its judgment, they should have prevailed on the merits and the trial court should have considered their claim for fees. Given our determinations on Appellants' prior points of appeal, this point is rendered moot.

### VIII.

We further conclude that the MSA achieves "State–Specific Finality" upon this opinion becoming final. Under the terms of the MSA, section II(ss) provides for what constitutes "State–Specific Finality:"

> "State–Specific Finality" means, with respect to the Settling State in question:
> (1) this Agreement and the Consent Decree have been approved and en-

**39.** 343 Mo. 597, 122 S.W.2d 915, 918 (1938).

**40.** *See Wemme v. First Church of Christ, Scientist*, 110 Or. 179, 219 P. 618 (1923) (on direct appeal); and *Wemme*, 110 Or. 179, 223 P. 250 (1924) (on a motion to recall the mandate).

**41.** *Id.* at 918, 223 P. 250.

**42.** *Kennedy v. Boden*, 241 Mo.App. 86, 231 S.W.2d 862, 866 (1950); *Continent Foods Corp. v. National–Northwood, Inc.*, 470 S.W.2d 315, 318 (Mo.App.1971).

tered by the Court as to all Original Participating Manufacturers, or, in the event of an appeal from or review of a decision of the Court to withhold its approval and entry of this Agreement and the Consent Decree, by the court hearing such appeal or conducting such review;

(2) entry by the Court has been made of an order dismissing with prejudice all claims against Released Parties in the action as provided herein; and

(3) the time for appeal or to seek review of or permission to appeal ("Appeal" from the approval and entry as described in subsection (1) hereof and entry of such order described in subsection (2) hereof has expired; or, in the event of an Appeal from such approval and entry, the Appeal has been dismissed, or the approval and entry described in (1) hereof and the order described in subsection (2) hereof have been affirmed in all material respects by the court of last resort to which such Appeal has been taken and such dismissal or affirmance has become no longer subject to further Appeal (including, without limitation, review by the United States Supreme Court).

Nearly all provisions of the MSA, including those provisions limiting certain marketing techniques by the tobacco defendants and the payments to the State, require that "State–Specific Finality" be reached before their inception. We note that under the express terms of the MSA section XVIII (*o*), all provisions and terms of the MSA are severable, unless expressly provided otherwise in subsection (*o*). Part (3) of that subsection states:

If a court materially modifies, renders unenforceable, or finds to be unlawful any term of this Agreement other than a Nonseverable Provision:

(A) The remaining terms of this Agreement shall remain in full force and effect.

(B) Each Settling State whose rights and obligations under this Agreement are affected by the court's decision in question (the "Affected Settling State") and the Participating Manufacturers agree to negotiate in good faith a Substitute Term. Any agreement on a Substitute Term reached between the Participating Manufacturers and the Affected Settling State shall not modify or amend the terms of this Agreement with regard to any other Settling State.

(C) If the Affected Settling State and the Participating Manufacturers are unable to agree on a Substitute Term, then they will submit the issue to non-binding mediation. If mediation fails to produce agreement to a Substitute Term, then that term shall be severed and the remainder of this Agreement shall remain in full force and effect.

Among the provisions not provided for as nonseverable under subsection (*o*) is Section XVII, which covers recovery of costs and attorney fees. Section XVII (d) provides the direct compensation of special assistants by the tobacco defendants:

The Original Participating Manufacturers agree that, upon the occurrence of State–Specific Finality in a Settling State, they will severally pay reasonable attorneys' fees to the private outside counsel, if any, retained by such Settling State. . . .

To the extent our opinion adjusts the attorney fees provision of the MSA to allow legislative disapproval or change, we find that those provisions regarding attorney fees and any separate agreements made directly between the special assistants and the tobacco defendants with regard to fees have no bearing on Missouri reaching "State–Specific Finality" as provided in the MSA.

 In the absence of prior legislative provisions to the contrary, an agreement by the attorney general on behalf of the

State for compensation of special assistant attorneys general ordinarily would not be subject to legislative restrictions or change after it has been entered and after the services have begun. But in this unusual case, the parties themselves, and the special assistant attorney general, have left open the possibility that the provisions could be changed. The attorneys have in fact introduced a new attorney's fee arrangement as part of the settlement. The parties also negotiated a deadline of December 31, 2001, for achieving state specific finality. We adopt the parties' deadline as the deadline for the legislature to take action upon this fee arrangement. If the General Assembly does not enact legislation by December 31, 2001, the settlement provisions as to attorneys fees as currently embodied in the MSA will be deemed final.

### IX.

As each of the proposed intervenors in this case have failed to satisfy the elements required for intervention, the trial court did not err in denying their motions for intervention. Accordingly, we affirm the decision by the Circuit Court for the City of St. Louis denying intervention for all proposed intervenors. Furthermore, for the reasons discussed in this opinion and subject to the power of the State by legislation to alter the attorneys' fee arrangement, we affirm the decision of the Cole County Circuit Court. The judgments are affirmed.