Verdell **PORTER, et al, Appellants,**

v.

**SHELTER MUTUAL INSURANCE COMPANY, Respondent.**

**No. WD 65963.**

Missouri Court of Appeals, Western District.

Oct. 16, 2007.

Application for Transfer to Supreme Court Denied Nov. 20, 2007.

Application for Transfer Denied Jan. 22, 2008.

Michael Pivac, Thomas Hearne, Springfield, David Lloyd Steelman, Rolla, for Appellant.

James Kent Lowry, Matthew D. Turner, Jefferson City, for Respondent.

RONALD R. HOLLIGER, Judge.

Four "Policyholders"[1] appeal from a judgment on the pleadings in favor of Shelter Mutual Insurance Company ("Shelter") on their action for declaratory judgment seeking a determination that Shelter is not entitled to withhold payment of the full cost of repair or replacement of partial property damage until repairs had been made or the property replaced. Stated another way, Policyholders contend that under their policies Shelter was not entitled to deduct depreciation in calculating their loss payments under their "replacement coverage policy."

Each of the policyholders sustained partial losses to their dwelling or other structure covered by their policies. Two sustained fire losses and the other two sustained storm damage. Neither the policyholders nor Shelter claim that the difference in covered risks affects the issues or interpretation of the policies except for one additional argument concerning the two fire losses.

■ Shelter investigated the losses and determined the estimated cost to repair the damage. It then deducted an amount it calculated to be depreciation and paid the balance to Policyholders. Shelter characterized this net sum as "actual cash value," a term not defined by the policy.[2] Because Shelter refused to pay the full cost to repair until repairs were actually completed the Policyholders filed this suit

1. Verdell Porter and the others filed suit jointly requesting a declaratory judgment concerning separate but identical homeowners insurance policies (FO–3 (10–1986)) issued by Shelter Insurance. Each sustained partial losses to their dwelling or other structure covered by the policy. Two sustained fire losses and the other two sustained storm damage. None of the parties or Shelter claims that the difference in covered risk affects the issues or interpretation of the policies.

2. It is unclear on the record before this court that Shelter's characterization of repair costs minus depreciation, as "actual cash value," is accurate. Actual cash value refers to the difference in the property's value immediately before and after the casualty. "The value of the property at the point immediately before the loss is, of course, equivalent to the actual value of the property at the time of the loss. Cost of repair is admissible as evidence of damage, but of itself it is insufficient to establish the amount of damage." *Wells v. Mo. Prop. Ins. Placement Facility*, 653 S.W.2d 207, 214 (Mo. banc 1983). However, because the question has not been briefed or argued, this opinion does not address whether the method employed to calculate actual cash value was appropriate. *See id.*

seeking to have their identical policies construed and Shelter to be ordered to pay the full cost to repair regardless of whether the repairs were completed (i.e., without deduction for depreciation). On Shelter's Motion for Judgment on the Pleadings, the court made extensive findings and entered judgment against Policyholders, who now appeal. That judgment is affirmed.

## Standard of Review

On appeal from the grant of a motion for judgment on the pleadings, "we review the allegations of Appellants' petition to determine whether the facts pleaded therein are insufficient as a matter of law." *State ex rel. Nixon v. Am. Tobacco Co.*, 34 S.W.3d 122, 134 (Mo. banc 2000). "The party moving for judgment on the pleadings admits, for purposes of the motion, the truth of all well pleaded facts in the opposing party's pleadings." *Id.* (quotation omitted). If the pleadings from their face demonstrate that the moving party is entitled to judgment as a matter of law, then the trial court is justified in granting a motion for judgment on the pleadings. *Id.*

Because we are reviewing the meaning of insurance policy language, our review is *de novo* and, accordingly, we "need not give deference to the trial court's interpretation." *Reese v. U.S. Fire Ins. Co.*, 173 S.W.3d 287, 297 (Mo.App. W.D.2005) (per curiam) (quoting *Nat'l Union Fire Ins. Co. v. City of St. Louis*, 947 S.W.2d 505, 506 (Mo.App. E.D.1997)). "The language used in an insurance policy is to be given its plain meaning." *Farm Bureau Town & Country Ins. Co. of Mo. v. Barker*, 150 S.W.3d 103, 105 (Mo.App. W.D.2004). Additionally, "[t]he plain meaning of the words and phrases used in an insurance policy is not determined in isolation, but with reference to the context of the policy as a whole." *Id.* at 105–06.

## The Policy Provisions

The relevant portions of the policies are contained in "Conditions–Section 1, 2 How Losses Are Settled." This section is divided into four (a, b, c, & d) subsections. Only subsections (b) and (d) are relevant here.[3] Subsection 2(b) provides for full or partial loss payments generally for damages to "Dwelling and Other Structures" and subsection 2(d) deals with a Missouri only provision concerning partial damage caused by fire. The principal dispute herein centers on the interpretation and interrelationship of various provisions of subsection 2(b) and particularly subsections 2(b)(2), (4), (5), and (6).

## How Loss is Paid Determined by Co–Insurance Clause

Shelter's insurance policy provides that the method of settlement depends upon "how the amount of insurance relates to the full replacement cost." The policy makes a distinction based on whether or not the affected property is underinsured. If the amount of insurance provided by the policy is less than 80% of the full replacement cost, the policyholder becomes a coinsurer of part of the loss. All parties agree that the amount of insurance of each policyholder was at least 80% of the full replacement cost. Under such circumstances, subsection 2(b)(2) of the policy states that Shelter "will pay the full cost to repair or replace the damaged part of the dwelling or other structure without deduction for depreciation." This section is qualified, however, by subsection 4(iii),

---

**3.** Subsection 2(a) deals with personal and other property damage not at issue here.

Subsection 2(c) also does not apply here.

which states that Shelter will pay no more than "the amount actually spent for necessary repair or replacement of the damaged dwelling or other structure." There are two other provisions of this section of the policy about which the parties disagree as to both applicability and/or meaning.

Subsection (b)(5) deals with costs to repair or replace of more than either $1000 or 5% of the insurance on the property. That subsection provides: "we will not be liable for full replacement cost *until actual repair or replacement is completed.*" (Emphasis added.) Policyholders contend that this provision covers only non-fire losses and does not apply to partial losses. If correct, these provisions would have no effect on the policy claims brought by the two policyholders claiming partial fire losses.[4]

Finally the parties cite to subsection 2(d) (a Missouri only provision) and disagree on whether the main policy term or a provision contained in an amendatory endorsement applies. The main policy provision states:

> In the event of partial damage to insured property caused by the peril of fire, we will, at your option, pay you up to the limit of liability that applies to the property, the repair cost of the damage or repair the damage so that the property will be in as good condition as before the fire.

The amendatory endorsement provides (in relevant part):

> In the event of partial damage to your insured property caused by the peril of fire, we will, at your option;
>
> (1) Pay you a sum of money equal to the damage to the property incurred to

the property (damage means the difference between the actual cash value of the property immediately before and immediately after the fire); or

(2) Repair the damage so that the property will be in as good of condition as before the fire.

> Payment will not exceed the limits of liability which apply to the property. You must notify us in writing of your option when you submit your proof of loss.

Finally, subsection 2(b)(7) provides:

> You may disregard these replacement cost loss settlement provisions when making a claim. If you do you may make further claim within 180 days after the loss for any additional loss you incur in replacing the damaged property.

### The Policyholders' Points on Appeal

In Point one, Policyholders contend that the trial court erroneously interpreted the law because the policies neither require nor permit payment of actual cash value. We interpret, as does Shelter, this point to argue that the only provisions of the policy applicable to partial losses, such as those of Policyholders, provide for payment of cost to repair or replace without deduction for depreciation. Closely related is Point Two, which contends the court again erroneously interpreted the policies because the policies do not condition payment of full cost to repair or replace damage on actual repair or replacement. In essence this argument has three parts: (1) that Shelter chose to omit any reference to actual cash value payments from the provisions governing their losses (where the insurance exceeds 80% of value and loss

---

**4.** Subsection (b)(6) covers smaller losses and does not contain the language limiting full payment until completion but rather states that *the full cost to repair or replace the* damaged property will be paid without deduction for depreciation. All of the losses in question exceed that limit.

exceeds $1000 or 5%) whereas actual cash value payment is expressly provided for in the sections dealing with personal property and where the coinsurance clause applies; (2) that section 2(b)(7) is ambiguous in not specifying what payment is to be made if the insured elects to disregard the loss payment provisions and therefore should be construed against Shelter; and (3) that contrary to what the trial court found, 20 CSR 500–1.100 does not "supplement" the policy language by requiring payment of actual cash value as a minimum benefit of the policy.

Point three deals with only the Beth and Cano partial fire losses and contends that the trial court erroneously interpreted the policies because the "Missouri only" provision of 2(d) is not subject to the limitations of 2(b)(5) (requiring actual repair or replacement) both under principles of policy interpretation and because section 379.150 prohibits any such condition.

Finally, Point four contends that judgment on the pleadings was inappropriate because the policy was ambiguous in that Policyholders presented evidence that Shelter's practical construction of the policy and other factors, including its claim adjusting practices, were contrary to the trial court's construction of the policy. We need reach this point only if we determine that the policy language is, in fact, ambiguous.

## Analysis

### Point One

In their first point, all Policyholders argue that cost of repair or replacement is the only damage calculation method set forth in the policy for partial storm or fire loss damages. Thus they argue that the trial court erred in finding that the policy permits Shelter to pay actual cash value as damages for these partial losses. Shelter responds essentially that its policy has a

clause amending it to conform to Missouri law and that 20 C.S.R. 500.1.100 requires payment at a minimum of actual cash value. Policyholders and Shelter spend considerable time and effort arguing about whether the Director of Insurance had authority to promulgate this regulation, whether Shelter's policy is its standard fire policy and whether the policies in question are even "fire policies" because they are homeowner's (or farm owner's) policies. Both sides either obfuscate or miss the mark. The difference between a fire policy and a homeowner's policy is merely the number of risks that are covered.

A homeowner's policy is in reality a bundle of different insurance policies covering different risks at the option of the buyer. But every homeowner's policy starts out with a "fire policy" as its basic coverage. *See* 1 Eric Mills Holmes & Mark S. Rhodes, Holmes's Appleman On Insurance 2d Section 1.11; *Dollard v. Depositors Ins. Co.*, 96 S.W.3d 885, 889 n. 7 (Mo.App. W.D.2002).

Disregarding all of these arguments and the regulation the parties overlook that RSMo. section 379.150 provides that every policy requires payment for partial losses of "a sum of money equal to the damage done to the property, or repair," which has been interpreted to mean "actual cash value." *Wells v. Mo. Prop. Ins. Placement Facility*, 653 S.W.2d 207, 209 (Mo. banc 1983). Actual cash value means a depreciated sum, i.e., the difference between the reasonable value of the property immediately before and immediately after the loss. *Id.* at 210. And in *Dollard* we said that this interpretation of "damage" is not based on statutory interpretation but recognizes that fire (casualty) policies generally and historically cover losses at actual cash value. 96 S.W.3d at 889.

While section 379.150 "contains language that deals with insurance coverage against *fire loss* ... [a]t least one decision ... has apparently considered that [the statute] might potentially apply to situations other than losses due to fire. *See, e.g., Cady v. Hartford Fire Ins. Co.,* 554 S.W.2d 499, 503 (Mo.App.1977)." *Lopez v. Am. Family Mut. Ins. Co.,* 96 S.W.3d 891, 892 n. 1 (Mo.App. W.D.2002). See also *Boren v. Fid. & Cas. Co. of N.Y.,* 370 S.W.2d 706 (Mo.App.1963) (applying the statute to a claim for partial damage to an automobile). In any event, Policyholders' claims are premised *solely* on their contention that they are entitled to the full cost to repair or replace without actually repairing or replacing and we need not decide whether Shelter was mistaken in paying actual cash value.

Point denied.

### Point Two

 Point two is closely related to point one. In four subpoints, Policyholders contend that subsection 2(b)(5) by its plain language applies only where the insureds are claiming full replacement cost whereas they are claiming full repair cost. This argument is based on the phrase "we will not be liable for full replacement cost," which does not contain the word "repair." This argument ignores the two references to "repair or replace" and "actual repair or replacement" also contained in that sentence. They also contend that if the subsection is ambiguous it must be construed against Shelter. In their third subpoint Policyholders claim that subsection 2(b)(4)(iii) is not a condition precedent to payment of their repair cost claims but rather is a limitation of payment to no more than the actual cost to repair or

replace. And, finally, they argue that if subsection 2(b)(4)(iii) is to be construed as a condition precedent to payment rather than a limitation on payment, then subsection 2(b)(4)(ii) is ambiguous and must be construed against Shelter. Because we find that subsection 2(b)(5) is not ambiguous and by its plain language sets a condition precedent requiring actual repair before the payment of repair cost without deduction for depreciation, we do not address the other arguments.

 An insurance policy is a contract and as with any contract "[a]ll terms are given their plain, ordinary, and usual meanings." *Spirtas Co. v. Div. of Design & Constr.,* 131 S.W.3d 411, 416 (Mo.App. W.D.2004). We determine whether a claimed construction of disputed language is reasonable. *Klonoski v. Cardiovascular Consultants of Cape Girardeau, Inc.,* 171 S.W.3d 70, 73 (Mo.App. E.D.2005). Here, Policyholders claim that the language "full replacement cost" in subsection 2(b)(5) is not the equivalent of the phrase "repair or replace." We agree with Shelter that Policyholders' proposed construction is neither reasonable nor logical. To adopt Policyholders' argument, we would have to conclude that the words "actual repair" in the last clause "until actual repair or replacement is completed" are meaningless. This we are prohibited from doing by the rules of construction. *Transit Cas. Co. in Receivership v. Certain Underwriters at Lloyd's of London,* 963 S.W.2d 392, 397 (Mo.App. W.D.1998) (a reasonable meaning must be given to each phrase and clause). We therefore hold that subsection 2(b)(5) unambiguously conditions payment for full repair costs upon actual repair of the damage.[5]

5. Because of this holding we do not address the arguments between Shelter and Policyholders about whether subsection 2(b)(4) is

ambiguous or not and whether it established a condition upon full payment. By its express terms, it is a limitation on damages under the

Even if subsection 2(b)(5) places conditions upon full replacement recovery, Policyholders argue that subsection 2(b)(7) gives them authority to disregard these conditions. Subsection 2(b)(7) states that Policyholders "may disregard these replacement cost loss settlement provisions when making a claim. If you do, you may make further claim within 180 days after the loss for any additional cost you incur in replacing the damaged property." However, if we were to adopt the meaning of subsection 2(b)(7) advanced by Policyholders, it would render the requirements and limitations provided for in 2(b)(5) meaningless and would be inconsistent with the intent of the parties. *See Kyte v. Am. Family Mut. Ins. Co.*, 92 S.W.3d 295, 299 (Mo.App.W.D.2002) ("Proper interpretation requires that we seek to harmonize all provisions of [an insurance] policy to avoid leaving some provisions without function or sense.") (citing *State ex rel. Mo. Highway Transp. Comm'n v. Maryville Land P'ship*, 62 S.W.3d 485, 492 (Mo.App. E.D. 2001)). When the policy states in subsection 2(b)(7) that the insured may disregard the replacement cost loss settlement provisions when making a claim, this means that the insured may make a claim under the policy for something other than replacement cost, that is, actual cash value. Furthermore, the second sentence of subsection 2(b)(7) references a circumstance where the insured has received actual cash value payment but later decides to repair or replace at a cost that exceeds actual cash value payment.

In sum, according to subsection 2(b)(5) of their policies, Policyholders Porter and Summers are not entitled to the full replacement cost of the damage until actual repair or replacement occurs. Therefore, policy and not a condition to any payment. In any event, it is consistent with our interpretation of subsection 2(b)(5).

Shelter was authorized to base its payment on actual cash value. Point denied.

■ Point three deals only with the Beth and Cano partial fire loss claims. They claim that there is no language in subsection 2(d) that allows Shelter to deduct depreciation from its payment or pay on the actual cash value basis.

Subsection 2(d) specifically pertains to fire losses. It states:

(Missouri only) In the event of partial damage to insured property caused by the peril of fire, we will, at your option, pay you up to the limit of liability that applies to the property, the repair cost of the damage or repair the damage so that the property will be in as good condition as before the fire.

In response, Shelter argues that the Missouri Amendatory Endorsement, which was attached to Policyholders' policies, supersedes subsection 2(d). The Missouri Amendatory Endorsement provides, in pertinent part:

(Missouri only) In the event of partial damage to your insured property caused by peril of fire, we will, at your option;

(1) Pay you a sum of money equal to the damage incurred to the property (damage means the difference between the actual cash value of the property immediately before and immediately after the fire); or

(2) Repair the damage so that the property will be in as good of condition as before the fire.

Payment will not exceed the limits of liability. . . .

Subsection 2(d) and the Endorsement are identical in substance and subject matter, with the sole exception of the type of

cash payment potentially recoverable. Subsection 2(d) provides for "repair cost" whereas the Endorsement provides for actual cash value payment. In *Dollard v. Depositors Insurance Co.*, 96 S.W.3d 885, 890 (Mo.App. W.D.2002), we held that the phrase "a sum of money equal to the damage," as stated in section 379.150, sets "the damage measurement calculation ... to be the actual cash value of the property immediately before the loss." Based on our holding in *Dollard*, Policyholders concede that Shelter's Missouri Amendatory Endorsement provides for the lesser payment of difference in actual cash value before and after the fire, rather than repair cost of the damage. Instead, Policyholders argue that the introductory language, "The following wording is added or will replace the same portions of Property Conditions applicable to the policy," is too unclear and uncertain to be applicable. We disagree. The Endorsement properly adds to and replaces parts of subsection 2(d). It replaces the phrase "the repair cost of the damage" and adds the phrase "[p]ay you a sum of money equal to the damage incurred to the property (damage means the difference between the actual cash value of the property immediately before and immediately after the fire)." Additionally, the subject matter and substance of subsection 2(d) is identical to the subject matter and substance of the Endorsement and, therefore, it is clear that the Endorsement was meant to supersede subsection 2(d). Accordingly, Policyholders had the option to be paid the actual cash value, which they were, or request that Shelter repair the damaged property.

Policyholders further argue that other introductory language of the Endorsement: "The following applies to insurance policies containing provisions that apply according to the 1943 Standard Fire Insurance Policy of the State of New York and are issued in the State of Missouri," is confusing because it is unclear whether the Endorsement applies to their policies. They contend that the language indicates that the Endorsement only applies to policies that are unchanged from the original language of the 1943 Standard Fire Insurance Policy of the State of New York and Policyholders' policies contain provisions that have been changed from the original language. In *Dollard*, we stated that certain language of the 1943 Standard Fire Insurance Policy of the State of New York was superseded by section 379.150 RSMo. 96 S.W.3d at 889. Originally, the 1943 Standard Fire Insurance Policy of the State of New York provided that the insurer had the right to decide whether the insured would receive cash for the loss or whether the insurer would repair or replace the damaged property. *Id.* at 889–90. However, in *Dollard* we held that section 379.150 "switches" this right of election to the insured. *Id.* at 890. Accordingly, Policyholders argue that, by its language, the Endorsement only applies to those policies that place the option with the insurer (in accordance with the 1943 Standard Fire Insurance Policy of the State of New York) and because the Endorsement places this option with the insured it does not apply. We disagree. The 1943 Standard Fire Insurance Policy of the State of New York is the standard policy for use in Missouri. *Id.* at 889. This is so despite the fact that statutes have superseded some of the original language. *See id.*

Furthermore, the Endorsement is not a stand-alone provision. It does not speak to "replacement coverage." It only speaks to the options available to the insured when partial damage is sustained by fire. A reader must look to subsection 2(b) for the "replacement coverage" provisions. Accordingly, the Endorsement incorpo-

rates subsection 2(b), including the condition precedent found in subsection 2(b)(5).

In conclusion, subsection 2(b)(5) requires actual repair or replacement of the damaged property before replacement cost will be paid. As Policyholders have not repaired or replaced their damaged structures, Shelter was permitted to pay actual cash value.

Because we find no ambiguity in the policy we do not need to consider Point four.

The judgment is affirmed.

JOSEPH M. ELLIS, Presiding Judge, concurs. ROBERT G. ULRICH, Judge, participated in oral arguments but was not a member of this court when this opinion was handed down.