Christopher S. DEATHERAGE
and Gloria R. Deatherage,
Appellants,

v.

Dorothy J. CLEGHORN, individually, Dorothy J. Cleghorn and Dale Cleghorn, Trustees of Dorothy J. Cleghorn Living Trust, Respondents.

No. 25466.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 1, 2003.

Scott B. Stinson, Mountain Grove, for appellants.

Randy R. Cowherd, Jeffery W. Laney, Haden, Cowherd, Bullock & McGinnis, LLC, Springfield, Daniel P. Wade, Ava, for respondents.

ROBERT S. BARNEY, Presiding Judge.

Christopher S. Deatherage and Gloria R. Deatherage ("Appellants" or "Christopher" and/or "Gloria") appeal from the judgment dismissing their cause of action pursuant to Respondents' "Motion to Dismiss for Res Judicata, Collateral Estoppel, and Splitting Causes of Action," in the *second* of two lawsuits involving the same subject matter, parties, and privities. Appellants raise four points of trial court error discussed below. We affirm.

The record[1] shows that on December 1, 1998, Appellants and Respondent Dorothy

---

1. The record is replete with affidavits and depositions of the parties and other witnesses, together with numerous pleadings and exhibits that have been filed in both litigations.

J. Cleghorn ("Dorothy") signed two documents entitled "Lease Agreement" and "Conditions for Contract of Deed" relating to 90 acres of land in Douglas County upon which a house sat ("the 1998 agreement").[2] Appellants took possession of the land and house, began making improvements to the property, and made payments under the agreement.

According to an affidavit executed on December 31, 2002, by Appellant Christopher, on or about March 8, 1999, some three months after the 1998 agreement, Appellants met with, Dale Cleghorn ("Dale"), Dorothy, and an attorney, Will Fletcher. Attorney Fletcher presented the parties with a deed, deed of trust, and promissory note ("the 1999 agreement").

In his affidavit, Christopher further averred that "Mr. Fletcher explained this would give my wife and I more protection, and would allow us to buy the property instead of leasing it." Christopher added that Attorney Fletcher "explained each document in detail and also the purchase financing arrangements," and the parties agreed to meet at a local bank the following day to have the documents notarized, exchange them, and then have them recorded. Christopher further averred that when the parties met at the bank, he and his wife signed the promissory note and deed of trust.[3] However, upon inquiring about the warranty deed, both Dorothy and Dale "told us they had left it at home, but they would sign it and record it the next day." Ultimately, the deed was never recorded or transferred to Appellants.

In a deposition taken on July 26, 2001, Dorothy acknowledged that the Appellants "wanted to get protection from this—for their—this property." She also related that Attorney Fletcher had prepared a warranty deed, a promissory note, and a deed of trust. Dorothy acknowledged receipt of the promissory note and her continued possession of the promissory note. Dorothy further acknowledged the existence of the warranty deed but testified that she had never delivered the warranty deed to Appellants, nor did she record the warranty deed. When asked if she had "give[n] [Appellants] anything whatsoever in exchange for the note", Dorothy replied "I didn't give them anything. I don't know if I did or I didn't."

In his deposition taken on July 26, 2001, Dale acknowledged the parties met in March 1999 with Attorney Fletcher because Appellants "suggested that the papers needed to be redone .... They didn't feel that these papers adequately protect-

The pleadings are unusually convoluted, requiring careful attention by the reader to the chronology of events arising during the course of the first litigation and then the second litigation, as is the norm in cases involving the application of the principles of res judicata and collateral estoppel.

While Appellants submitted a "Legal File" and Respondents have submitted a "Supplemental Legal File," neither submission is a model of clarity.

2. Under this agreement, Appellants as lessees and purchasers would, *inter alia*, pay a "Minimum payment per month of $400.00" for "not more than 25 months", and upon receipt of 25 payments of $400.00 each, or upon the payment of $10,000.00, whichever came first,

"a contract for deed will be drawn up for the sum total of $78,000.00 to be paid at a minimum of $400.00 per month." Under these documents, monthly payments would be made over a term of 18 years, 4 months, and after "Payoff ... a clear deed will be given by the owner or estate." It should be noted that among the named Respondents, only Dorothy signed the agreement as "Owner."

3. The record reveals a copy of an undated promissory note payable to "Dorothy J. Cleghorn, Trustee for the Dorothy J. Cleghorn Trust or order" and executed by Appellants in the sum of $86,800.00. It was made payable at the rate of $400.00 per month but provided for no interest.

ed them against my former wife." Dale acknowledged that Attorney Fletcher had prepared a warranty deed and a promissory note but related that his mother, Dorothy, had not delivered the warranty deed to Appellants. Dale related that his mother received the promissory note after Appellants signed it.

The record further shows that some seventeen months later (August 2000) the friendship between the parties became strained due to personal differences between Christopher and Dale. Dorothy informed Appellants that she and Dale had changed their mind about selling the property.[4]

Appellants continued to make payments of $400.00 a month to Dorothy under the 1998 agreement, but Dorothy refused to accept the payments, because Appellants now included the word "payment" on their checks, instead of "rent." In time, Appellants began sending payments to Dorothy's attorney.

With the payment of $400.00 in December 2000, Appellants contended they had satisfied all the conditions for the contract for deed under the 1998 agreement and they had their attorney submit a "contract for deed" to Dorothy for her signature, pursuant to the 1998 agreement. Dorothy refused to sign the contract and continued to insist that Appellants vacate the premise.

On January 4, 2001, Appellants filed their first suit, case number CV0101–5CC based on the terms of the 1998 agreement, against Dorothy, individually, and against Dorothy J. Cleghorn and Dale Cleghorn, as trustees of the Dorothy J. Cleghorn Living Trust ("Respondents").

As ultimately submitted—by way of a "Second Amended Petition" in two counts—Appellants sought a declaratory ruling from the trial court that they were entitled to possession of the land in question because the conditions for the contract for deed were satisfied pursuant to the 1998 agreement. Appellants also asked for an injunction requiring Respondents to execute a contract for deed and, thereafter, a warranty deed, per the terms of the 1998 agreement.

On May 15, 2002, Respondents filed their "Motion for Judgment on the Pleadings." In pertinent, part the motion set out that the December 1, 1998, "oral agreement [was] barred by the statute of frauds and therefore Counts One and Two [of Appellants' Second Amended Petition failed] to state a cause of action."

■ Five days later, Appellants filed their "Motion to Amend Petition." The docket sheet is devoid of a showing that the motion was ever ruled on by the trial court.[5] The docket sheet also shows an

---

4. As best we discern, based primarily on the August 14, 2002, deposition of Attorney Fletcher; prior to March 4, 1999, Dorothy was the sole owner of the property in question. According to Attorney Fletcher, on March 4, 1999, he presented Dorothy with a "revocable trust" together with a "quit claim deed from Dorothy Cleghorn to Dorothy Cleghorn, trustee for Dorothy J. Cleghorn Trust." It was his interpretation that after execution of the quit claim deed the owner of the property was "[t]he Dorothy J. Cleghorn Trust."

5. Rule 55.33(a), Missouri Court Rules (2002) provides in pertinent part that:

A pleading may be amended once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the pleading may be amended at any time within thirty days after it is served. *Otherwise, the pleading may be amended only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.*

(Emphasis added.)

entry, dated July 19, 2002, to-wit: "Third Amended Petition (Proposed) filed . . . ." Again, the docket sheet does not show any ruling relating to these pleadings. Despite the fact the "Third Amended Petition" was not presented to the trial court for a ruling, we discuss these pleadings in some detail, because they are germane to the issue of whether Appellants are now precluded from reasserting many of the same claims in the instant litigation.

In Count One of their proposed "Third Amended Petition," Appellants reiterated the facts and the same request for relief as previously set out in Count One of their "Second Amended Petition." Alternatively, they also averred that the two documents in question that had been executed on December 1, 1998, "were sufficient to constitute a binding contract for sale of lands, and they [were] entitled to specific performance . . . ."

In Count Two of their proposed "Third Amended Petition" entitled "Action for Specific Performance of Oral Contract with Partial Performance (Entered Into Between the Parties on 3/8/1999)," Appellants reiterated their allegations as found in Count One of their "Second Amended Petition."

Count Two also set out, in pertinent part, that: on March 8, 1999, the parties met at Dale's home; that at that time Dale, Dorothy, and Dorothy's attorney, Will Fletcher, were present; and that the parties "entered into an oral contract in order to completely amend and replace the previous contracts [i.e., the 1998 agreement] for sale of the land."

Appellants further alleged in Count Two that Attorney Fletcher had prepared and presented to the parties three documents: (1) a promissory note from Appellants to Dorothy J. Cleghorn in the amount of $86,800.00, being the "balance due under the original contract;" (2) a deed of trust to secure the promissory note; and (3) a warranty deed showing a conveyance of the land in question from Dorothy to Appellants. In this same count, Appellants further pled that pursuant to the new oral agreement the deed was to be "recorded immediately."

Appellants also averred in Count Two that the parties met on the following day, March 9, 1999, and that Appellants "did execute and deliver to [Respondents] the promissory note and deed of trust," which was duly recorded, and despite assurances to the contrary, Respondents refused to sign the warranty deed and have it recorded thereby breaching the terms of their oral contract. Accordingly, Appellants sought specific performance and requested the trial court to order Respondents to execute a warranty deed conveying the real property to Appellants. Alternatively, Appellants sought an order vesting Appellants with title to the real property, subject to the promissory note and deed of trust, and sought a declaration that they were entitled to exclusive possession of the real property.[6]

On July 30, 2002, arguments were heard on Respondents' "Motion for Judgment on the Pleadings."[7] Then on August 14, 2002, after having previously advised all parties that it was designating Respondents' "Motion for Judgment on the Plead-

---

"Whether to allow the amendment of a pleading is up to the discretion of the trial court, and this court will not disturb its decision absent an obvious and palpable abuse of discretion." *Estate of Anderson v. Day,* 921 S.W.2d 35, 39 (Mo.App.1996).

6. In the remaining two counts, of the proposed "Third Amended Petition" Appellants sought damages against Respondents for fraud and punitive damages, respectively.

7. The docket sheet reflects that Respondents' motion was sustained.

ings" a motion for summary judgment, the trial court sustained Respondents' "Motion for Judgment on the Pleadings," and entered judgment against Appellants on Counts One and Two of their "Second Amended Petition," in case number CV0101–5CC—the first litigation.[8] No mention was made of Appellants' proposed "Third Amended Petition."

Prior to completion of post-trial proceedings in the first litigation, Appellants, on August 20, 2000, filed their second suit against Respondents in case number CV0102–183CC, the instant litigation.

Boiled down to the essentials, in this second suit Appellants replicated the facts and related pleadings previously set out in their *proposed* "Third Amended Petition" of their first suit.

Count One of their petition in the *second* suit sought specific performance of the 1998 agreement; Count Two sought performance of the 1999 agreement; Count Three sought damages for fraud; and Count Four sought punitive damages.

Then with regard to their *first* suit, on August 23, 2002, Appellants filed their "Motion to Amend/Clarify Judgment or in the Alternative Motion to Reinstate Plaintiffs' Ancillary Claims."

In this motion, Appellants pled that "there were other ancillary matters still pending with this Court, including, but not limited to, [Appellants'] Motion to Amend to state alternate causes of action." Appellants pled they had the "following potential causes of action against [Respondents], which have yet to be pleaded or ruled on: Breach of *written* agreements dated 12/1/1998 [and] Breach of separate contract entered into between the parties on 3/8/1999 . . . ."

Pursuant to this same motion Appellants also requested the trial court enter an "Amended Judgment clarifying the following: 1. Specifying which claims are being adjudicated on the merits (i.e. 'with prejudice') [and] 2. Clarifying that all parties are being given leave to withdraw the ancillary matters without prejudice, (or, alternatively, ruling on the ancillary matters with specificity.)"

In response to this latest motion filed by Appellants in the first litigation, the trial court filed its "Amended docket entry" on September 5, 2002. The trial court subsequently ruled, in pertinent part, that:

> [Respondents] are entitled to Judgment on the Pleadings, on the merits, as to Counts I and II of [Appellants' Second Amended petition], to the extent that said claims are based on an oral contract to sell real estate or a mandatory injunction.[9] [Respondents dismiss] all counter claims without prejudice and [Appellants dismiss] all other claims without prejudice.

> *The Court overrules all other motions filed by [Appellants] and [Respondents].*

> Any and all other claims, either primary or ancillary, not directly addressed by this order of Judgment on the Pleadings, are dismissed without prejudice.

> Signed, Michael E. Merrell, Judge.

(Emphasis added.)

Thereafter, no party made motions for further clarification of the trial court's September 5, 2002, judgment, relating to the first suit.

Returning now to the second litigation, in response to Appellants' filing of their petition in the second suit, Respondents

---

8. Appellants had voluntarily dismissed Counts Three and Four of their Second Amended Petition.

9. In this connection *see Gillespie v. Pulsifer,* 655 S.W.2d 123, 126 (Mo.App.1983).

filed their "Motion to Dismiss for Res Judicata, Collateral Estoppel, and Splitting Causes of Action," together with suggestions in support of their motion on October 18, 2002.

On February 21, 2003, the trial court in the second litigation entered its "Amended Judgment Order." In pertinent part it set out:

"Comes now the Honorable John G. Moody, and does hereby sustain [Respondents'] Motion to Dismiss in this cause."

This appeal followed.

■■■ Prior to our discussions of Appellants' points relied on, we initially observe that the "doctrine of res judicata, or claim preclusion, operates as a bar to the reassertion of a cause of action that has been previously adjudicated between the same litigants or those in privity with them." *Jeffrey v. Cathers*, 104 S.W.3d 424, 430 (Mo.App.2003).

"The doctrine of res judicata bars a claim if the following elements are satisfied: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the persons or parties to the action; and (4) identity of the quality or status of the person for or against whom the claim is made."

*Felling v. Giles*, 47 S.W.3d 390, 394 (Mo. App.2001) (quoting *Missouri Real Estate & Ins. Agency, Inc., v. St. Louis County*, 959 S.W.2d 847, 850 (Mo.App.1997)).

Res judicata applies "not only to points and issues upon which the court was required by the pleadings and proof to form an opinion and pronounce judgment, but to every point properly belonging to the subject matter of litigation and which the parties, exercising

reasonable diligence, might have brought forward at the time."

*Lay v. Lay*, 912 S.W.2d 466, 471 (Mo. banc 1995) (quoting *King Gen. Contractors, Inc. v. Reorganized Church of Jesus Christ of Latter Day Saints*, 821 S.W.2d 495, 501 (Mo. banc 1991)).[10]

■■■ "The doctrine of collateral estoppel, or issue preclusion, precludes the same parties or those in privity from relitigating issues that were necessarily and unambiguously decided in a previous judgment." *Jeffrey*, 104 S.W.3d at 430.

The elements of collateral estoppel are: (1) the issue decided in the prior adjudication mirrors that in the present action; (2) the prior adjudication resulted in a final decision on the merits; (3) the party against whom collateral estoppel may apply participated as a party or in privity with a party to the prior adjudication; and (4) the party against whom the doctrine may apply has had a full and fair opportunity to litigate the issue.

*Galaxy Steel & Tube, Inc. v. Douglass Coal & Wrecking, Inc.*, 928 S.W.2d 420, 422 (Mo.App.1996).

■ "For either doctrine to apply, a final judgment on the merits must have been rendered involving the same claim or issue sought to be precluded in the cause in question." *Jeffrey*, 104 S.W.3d at 430.

■■■ "The doctrine of res judicata takes on the character of the rule against splitting a cause of action." *Lay*, 912 S.W.2d at 471. Both doctrines " 'are closely related because both are designed to prevent a multiplicity of lawsuits.' " *Id.* at 472 (quoting *Burke v. Doerflinger*, 663 S.W.2d 405, 407 (Mo.App.1983)).

"A cause of action which is single may not be split and filed or tried piecemeal,

---

10. While res judicata is an affirmative defense, Rule 55.08, Missouri Court Rules (2002), a motion to dismiss for failure to state a claim is appropriate. *Chesterfield Village, Inc., v. City of Chesterfield*, 64 S.W.3d 315, 318 n. 1 (Mo. banc 2002).

the penalty for which is that an adjudication on the merits in the first suit is a bar to a second suit. In general, the test for determining whether a cause of action is single and cannot be split is: 1) whether separate actions brought arise out of the same act, contract or transaction; 2) or whether the parties, subject matter and evidence necessary to sustain the claim are the same in both actions." *Id.* (quoting *Burke v. Doerflinger,* 663 S.W.2d 405, 407 (Mo.App.1983)).

"While not expressly stated in the Rule, defenses of res judicata and issue preclusion are in essence defenses alleging the plaintiff has failed to state a claim upon which relief may be granted." *King Gen. Contractors, Inc.,* 821 S.W.2d at 498. "Such defenses may succeed only if uncontroverted facts demonstrate the present suit is groundless, but the trial court must take judicial notice of the prior judgment." *Id.* at 498–99 (citation omitted). However, "a motion to dismiss for failure to state a claim upon which relief can be granted is treated as a motion for summary judgment where additional matters are presented to and not excluded by the trial court." *Xavier v. Bumbarner & Hubbell Anesth.,* 923 S.W.2d 428, 430 (Mo.App.1996); *see* Rule 55.27(a)(6), Missouri Court Rules (2002).

Here, as in the first litigation, the parties introduced evidence beyond the pleadings. The trial court received evidence from both sides. "When the parties introduce evidence beyond the pleadings, a motion to dismiss is converted to a motion for summary judgment." *Xavier,* 923 S.W.2d at 430; *Smithville v. St. Luke's Northland Hosp. Corp.,* 972 S.W.2d 416, 419 (Mo.App.1998); *see also King Gen. Contractors, Inc.,* 821 S.W.2d at 499 ("The acceptance and consideration of this evidence by the court effectively 'transformed' the proceeding to one under Rule 74.04."). This is the case "even though the trial court did not give notice of the conversion under Rule 55.27." *Jeffrey,* 104 S.W.3d at 428. Accordingly, as in an order granting summary judgment, "this [C]ourt views the evidence in a light most favorable to the party against whom the judgment was entered." *Smithville,* 972 S.W.2d at 419.

" 'Summary judgment is appropriate when a movant demonstrates, through pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, that there is no genuine issue of material fact and the admitted facts show a legal right to judgment.' " *Id.* (quoting *Smith v. Taylor–Morley, Inc.,* 929 S.W.2d 918, 921 (Mo.App.1996)); *see also ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 380 (Mo. banc 1993).

In their first point, Appellants maintain the trial court erred in sustaining Respondents' motion to dismiss for res judicata because the two claims, (i.e., the 1998 agreement and the 1999 agreement), do not constitute a single cause of action as a matter of law. Appellants maintain the two claims were separate and distinct contracts, and the evidence necessary to sustain each claim was completely different as to each separate contract. This point lacks merit.

As previously related, the doctrine of res judicata "precludes not only those issues on which the court in the former case was required to pronounce judgment, 'but to every point properly belonging to the subject matter of litigation and which the parties, exercising reasonable diligence, might have brought forward at the time.' " *Chesterfield Village,* 64 S.W.3d at 318 (quoting *King Gen. Contractors, Inc.,* 821 S.W.2d at 501).

"To determine whether a claim is barred by a former judgment, the question is whether the claim arises out of the same 'act, contract or transaction.'" *Id.* at 318–19 (quoting *Grue v. Hensley,* 357 Mo. 592, 210 S.W.2d 7, 10 (1948)); *see also King Gen. Contractors, Inc.,* 821 S.W.2d at 501.

The term 'transaction' has a broad meaning: *King General Contractors, Inc.,* cites the Restatement (Second) of Judgments, section 24, which says that the claim extinguished includes all rights of the plaintiff to *remedies* against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

*Chesterfield Village,* 64 S.W.3d at 319.

■ Viewed from the foregoing perspective, it is our view that the 1998 and 1999 agreements are interrelated. Both lawsuits filed by Appellants were efforts to force the sale of the same 90 acres of land arising from the same 1998 agreement. The 1999 agreement—which followed the 1998 agreement by only three months—was entered into by the same parties or their privities at the behest of Appellants, in an attempt to give Appellants "more protection".[11]

Indeed, Appellants admitted the transactions were related. During the first suit, in their post-judgment motion to clarify Judge Merrell's original judgment and in their suggestions in support, Appellants set out that:

On May 15, 2002, [Appellants] discovered "new evidence" indicating that the parties had rescinded the 12/1/1998 documents, and replaced it with a new contract. This affirmative claim has not yet been presented for review by this Court or any other Court. *Yet, it arises essentially out of the same transaction* ....

(Emphasis added.)

■ "'The doctrine of res judicata precludes parties from contesting matters that the parties have had a full and fair opportunity to litigate.'" *U.S. Fidelity & Guar. Co. v. Commercial Union Ins. Co.,* 943 S.W.2d 640, 641 (Mo. banc 1997) (quoting *State ex rel. Trotter v. Cirtin,* 941 S.W.2d 498, 499 (Mo. banc 1997)).

■ As further explained in Point Two, Appellants have not shown any justifiable reason or excuse for not having called up their Third Amended Petition in the first litigation. They are now barred from pursuing this claim in a second litigation. "A party may not litigate a claim and then, upon an adverse judgment, revive the claim on cumulative grounds that could have been brought before the court in the first proceeding." *Id.* at 642; *see also Lay,* 912 S.W.2d at 471. Point One is denied.

In Point Two, Appellants maintain that even if it were determined that the two contracts claims constituted a "single cause of action," they assert they were entitled to file their 1999 contract claim in a separate suit under the "excusable igno-

11. As previously set out, the record shows Appellants were the same in both suits. As for Respondents, the record shows that in the first suit, only Dorothy, individually, signed the 1998 agreement in her capacity as "Owner," although Dale and the "trustees of the Dorothy J. Cleghorn Living Trust" were named Respondents.

The record also shows, as previously set out, that Dorothy, as sole owner, quitclaimed her interest in the property to the Dorothy J. Cleghorn [Living Trust] on or about March 4, 1999.

The promissory note executed by Appellants on March 9, 1999, was made payable to "Dorothy J. Cleghorn, Trustee for the Dorothy J. Cleghorn Trust or order." It is clear then, as far as the property ownership is concerned, the parties or their privities are the same in both litigations.

rance" and "reasonable diligence" exceptions to the rule of res judicata.

They also maintain that the "first trial judge refused three separate motions that attempted to raise the 1999 contract claim, and expressly held that ... such requests were dismissed without prejudice to the 1998 claims."

Lastly, they premise trial court error on the basis that Appellants "did not have a 'full and fair opportunity to litigate' their claims in the first suit, and ... 'the prior litigation did not yield a coherent disposition of the controversy.' "

Among the arguments found in Point Two are Appellants' assertions that "if a plaintiff does not have knowledge of all the facts when he files his first suit, he cannot be sanctioned as to an issue that *could not have been* raised based on his knowledge." Appellants also maintain that, barring their own negligence, there is an exception to the rule against splitting a cause of action, which is "uniformly recognized" and "allows a Plaintiff to raise his claim in subsequent litigation, when he was unable to raise that claim at the time of filing of the first suit, as the result of *unavoidable or excusable ignorance.*" (Emphasis added.) Appellants cite dicta found in *Szombathy v. Merz*, 347 Mo. 776, 148 S.W.2d 1028, 1030 (1941), *Wheeler Saving Bank v. Tracey*, 141 Mo. 252, 42 S.W. 946, 947 (1897), and *Mullen v. General Motors Corp.*, 640 S.W.2d 144, 146 (Mo.App.1982) in support, but readily concede that "[n]o Missouri appellate court has published an opinion where it applied the exception ...."

Appellants additionally argue that at the time of the filing of their first suit they lacked knowledge of the necessary facts to plead their 1999 contract claim, particularly with respect to proving "two critical issues: 1.[t]hat the 1998 agreement had been *mutually rescinded* by all parties[, and] 2.[t]hat [Respondents] had promised a *consideration* for the receipt of the Note and Deed of Trust, i.e., the promise to deliver or record the Warranty Deed to [Appellants]."

Appellants also argue that "[a]fter the first suit was filed, [Respondents] concealed the fact that they had agreed to a mutual rescission of the 1998 agreement, maintaining that the 1998 lease continued to be the only operative contract between the parties." Additionally, Appellants assert that Appellants "did not fully understand the legal relationship between the 1998 and 1999 documents." Lastly, Appellants argue that they "did not obtain any evidence to prove the two critical issues of rescission and consideration until 5/15/2002 ...." These arguments are not persuasive.

As previously related, according to the December 31, 2002, affidavit filed by Christopher, Appellants and Respondents met on March 8, 1999, to discuss the 1999 documents. Christopher averred that Attorney Fletcher "explained this would give my wife and I more protection, and would allow us to buy the property instead of leasing it."

Christopher's affidavit further recited the parties met again the following day "at the bank in Ava" and "signed the Deed of Trust and Promissory Note before a Notary and delivered them to Dorothy." Christopher also averred that Appellants "asked Dale and Dorothy about our deed, and they told us they had left it at home, but they would sign it and record it the next day."

Additionally, according to Christopher's affidavit, Appellants retained their attorney to file their first suit

*in December of 2000, and provided him copies of all of the documents we had in our possession at that time, which were as follows:*

*Original contract documents dated 12/1/1998 entitled "Lease Agreement (and) Conditions for Contract for Deed"* (layman documents drafted by Dale Cleghorn).

*[R]ecorded Deed of Trust signed by Plaintiffs dated 3/9/1999[.]*

*Receipt from Will Fletcher to Plaintiffs for $50.00 "for Warranty Deed" dated 3/8/1999[.]*

*Copies of all cancelled checks and receipts for monthly payments* over the past 25 months.

*Letter from [Respondents'] attorney stating lease had been breached and demanding possession.*

(Emphasis added.)

Christopher also averred in his affidavit that his attorney "asked us about our meeting and conversations with Mr. Fletcher which had occurred 18 months ago. We told him we had understood the new documents were to protect us and would allow us to buy the property instead of lease."

Furthermore, deposition testimony of both Dorothy and Dale taken in July 2001 confirm the essentials of what Christopher averred in his affidavit.

██ Based on the foregoing, we can reasonably infer Appellants' attorney was made aware, as early as the end of December 2000 or at the latest by July 2001, of the particulars of the 1999 agreement; and that Appellants' attorney was made aware that Appellants had executed a promissory note in the amount of $86,800.00 as consideration for the warranty deed. In short,

the foregoing information was available to Appellants during the course of the *first* litigation.

Additionally, it can reasonably be inferred that during this same time period, Appellants' attorney was made aware that Dorothy had not delivered the warranty deed to Respondents and that Dorothy had changed her mind about selling the property.

We can also reasonably infer, based on the foregoing affidavit and deposition testimony, that Appellants and their learned attorney were well-aware of the primary facts surrounding the 1999 documents before the late stages of their first lawsuit. This belies their claim that they were unavoidably or excusably ignorant of the facts such that they were prevented from making a claim under the 1999 agreement until May 2002.

██ Furthermore, on July 19, 2002, during the first litigation, Appellants in fact "filed" a "proposed" "Third Amended Petition," which encompassed their claim for specific performance under the 1999 agreement. Inexplicably, the record is devoid of a showing that Appellants sought a ruling from the trial court granting them leave to formally file the amended pleadings prior to the July 30, 2002, hearing.[12]

Indeed, it was not until August 23, 2002, *after Judge Merrell had entered judgment against Appellants in the first suit,* that Appellants filed their "Motion to Amend/Clarify Judgment ...", seeking to have a ruling on "other ancillary matters

---

12. "There is no absolute right to amend a petition." *Saidawi v. Giovanni's Little Place, Inc.,* 987 S.W.2d 501, 505 (Mo.App.1999). "Liberal amendment rules are not meant to be employed as a stratagem of litigation; rather, the purpose of the grant of an amendment is to allow a party to assert a matter unknown or neglected from inadvertence at the time of the original pleading." *Estate of Anderson,* 921 S.W.2d at 39. As noted previously, "[w]hether to allow the amendment of a pleading is up to the discretion of the trial court, and this court will not disturb its decision absent an obvious and palpable abuse of discretion." *Id.*

still pending with this Court, including, but not limited to, [Appellants'] Motion to Amend to state alternate causes of action" including "the following potential causes of action against [Respondents] which have yet to be pleaded or ruled on: Breach of *written* agreements dated 12/1/1998 [and] Breach of separate contract entered into between the parties on 3/8/1999 . . . ."

As we previously set out, the trial court in the first suit, in pertinent part, determined that Respondents were entitled to "[j]udgment on the Pleadings, on the merits" as to Appellants' claims in their "Second Amended Petition." Also, the trial court overruled "all other motions filed by [Appellants] and [Respondents]." We interpret this latter phrase as including pending motions to amend their pleadings to include claims growing out of the 1999 agreement. Lastly, Appellants did not appeal any portion of the trial court's judgment in this first litigation, nor did they seek further clarification of the amended judgment from the trial court.[13]

Based on the foregoing, it is difficult for us to conclude that Appellants were not accorded a full and fair opportunity to litigate all their claims in the first suit. We determine that the trial court's action in the first litigation effectively yielded a coherent disposition of the controversy based on *the relief requested* by Appellants in their pleadings. We also conclude that Appellants did not exercise reasonable diligence in bringing their proposed claims before the trial court in the first suit. Point Two is denied.

In Point Three, Appellants aver that the trial court erred in sustaining Respon-

dents' motion to dismiss for res judicata, "in that this precise legal issue was raised before Judge Merrell in the first suit, and he ruled that [Appellants] had the right to file claims involving the 1999 contract as a separate suit." Appellants maintain Respondents are, therefore, precluded by collateral estoppel from again raising this issue in the current suit.

 This point has largely been addressed in our discussion of the previous point when we determined that Judge Merrell had, indeed, overruled all of Appellants' pending motions by his express pronouncement in his amended judgment that "[t]he Court overrules all other motions filed by [Appellants] and [Respondents]." Furthermore, Appellants have cited no authority in support of this point. "Failure to cite relevant authority supporting the point or to explain the failure to do so preserves nothing for review." *Kent v. Charlie Chicken, II, Inc.,* 972 S.W.2d 513, 516 (Mo.App.1998). Point Three is denied.

In Point Four, Appellants argue that Respondents' purported false statements throughout the first lawsuit and their failure to produce documents delayed Appellants' counsel from learning the true facts surrounding the 1999 agreement. Appellants assert that save for this purported inequitable conduct, Appellants would have been positioned to raise their claim at an earlier stage in their first litigation. They contend *Respondents* are now barred by equitable estoppel from asserting their defense of res judicata.

Appellants further aver that Respondents have waived their right to rely on the defense of res judicata by not asserting

---

**13.** The remainder of the recitation of Judge Merrell's amended judgment to-wit: "Any and all other claims, either primary or ancillary, not directly addressed by this order of Judgment on the Pleadings, are dismissed without prejudice[,]" we consider to be sur-

plusage, in that the pronouncement exceeded the relief prayed for. *See Continent Foods Corp. v. National–Northwood, Inc.,* 470 S.W.2d 315, 318 (Mo.App.1971); *see also State ex rel. Nixon v. American Tobacco Co.,* 34 S.W.3d 122, 137 (Mo. banc 2000).

their position at the earliest opportunity. They rely on language found in *Evans v. St. Louis Comprehensive Neighborhood Health Center*, 895 S.W.2d 124 (Mo.App. 1995), wherein our brethren in the Eastern District of this Court observed that the "rule against splitting a cause of action is a part of a group of defenses frequently lumped together as *res judicata*. It is for the benefit of the defendant and may be waived." *Id.* at 126. Appellants' allegations have no merit.

As previously recited, the record reveals Appellants were actual witnesses to the facts surrounding the documents relating to the 1999 agreement prior to the filing of their first lawsuit. We have discussed in our analysis of prior points that affidavit and deposition testimony inferentially revealed that Appellants and their attorney were cognizant of the primary facts regarding the 1999 agreement as early as December 2000 or by July 2001 at the latest. These facts belie Appellants' assertions that they had insufficient knowledge to bring any claim regarding the 1999 agreement before May 2002, during the waning days of the first litigation.

Additionally, Respondents could not have raised their defense of res judicata and related doctrines until there was a final judgment resulting from the *first* litigation. *See Jeffrey*, 104 S.W.3d at 430.

The record shows that Respondents promptly filed their "Motion to Dismiss" and "Motion to Dismiss for Res Judicata, Collateral Estoppel, and Splitting of Causes of Action" and their attendant suggestions in support no later than October 18, 2002, following the filing of Appellants' second suit, and after the judgment in the first suit became final.

In *Evans*, defendant attempted to raise the doctrine of res judicata as a defense more than *a year after* a judgment had been entered against it, thereby waiving the defense. *Evans*, 895 S.W.2d at 126. Here, Respondent asserted the defense of res judicata shortly after the onset of the second litigation—within three weeks of the final judgment in the first litigation. Under these circumstances we cannot perceive how Respondents waived their defense of res judicata. Point denied.

The amended judgment is affirmed.

PREWITT, and GARRISON, JJ., concur.