

# SUPREME COURT OF MISSOURI
## en banc

TIMOTHY S. PESTKA et al., )
)
             Appellants, )
)
vs. ) No. SC95369
)
THE STATE OF MISSOURI, et al., )
)
             Respondents. )

### APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY
The Honorable Jon E. Beetem, Judge

*Opinion issued July 26, 2016*

Timothy S. Pestka and Rudy M. Chavez (hereinafter, "Appellants") request this Court to determine whether the Missouri Senate (hereinafter, "the senate") violated article III, section 32 of the Missouri Constitution when it considered, voted upon, and purported to pass Truly Agreed To and Finally Passed House Bill 150 (hereinafter, "HB 150") during a veto session convened in September 2015. This Court holds the senate lacked authority to vote to override the governor's veto during the September 2015 veto session because only bills returned by the governor on or after the fifth day before the end of the regular legislative session can be taken up during a September veto session. The circuit court's judgment is reversed.

## Factual and Procedural History

The facts are undisputed. On April 21, 2015, the Missouri General Assembly passed HB 150, which made changes to Missouri's unemployment benefits compensation statutes. The governor vetoed HB 150 on May 5, 2015, more than five days before the General Assembly adjourned *sine die*. Before adjournment, the Missouri House of Representatives (hereinafter, "the house") reconsidered HB 150 and voted to override the governor's veto. On May 15, 2015, the senate adjourned without taking any action to reconsider HB 150 or to override the governor's veto.

An unrelated bill, which was vetoed after the General Assembly adjourned, resulted in the General Assembly reconvening for a veto session pursuant to article III, section 32, commencing September 16, 2015. During the veto session, the senate reconsidered HB 150 and voted to override the governor's veto. On October 16, 2015, most of the changes to the unemployment benefits compensation statutes contemplated by HB 150 went into effect. The remaining changes went into effect on January 1, 2016.

Appellants filed a declaratory judgment action to declare HB 150 unconstitutional and requested the entry of a temporary restraining order, preliminary injunction, and permanent injunction prohibiting HB 150 from being executed or enforced. Appellants claimed the senate's veto during the September 2015 veto session was untimely because it violated the procedure set forth in article III, section 32. The state filed a motion for judgment on the pleadings, arguing the senate's vote was timely and did not run afoul of article III, section 32.

The circuit court sustained the state's motion, finding the senate's reconsideration

of HB 150 during the September 2015 veto session did not violate article III, section 32. The circuit court found article III, section 32 did not limit what bills could be considered during the veto session and there was no requirement that a vetoed bill must be reconsidered before the end of the regular legislative session. Appellants appeal. This Court has exclusive jurisdiction. Mo. Const. art. V, sec. 3.

## Standard of Review

When evaluating the circuit court's judgment sustaining the state's motion for judgment on the pleadings, this Court reviews the allegations in Appellants' petition to determine whether the facts pleaded therein are insufficient as a matter of law. *State ex rel. Nixon v. Am. Tobacco Co., Inc.*, 34 S.W.3d 122, 134 (Mo. banc 2000). A circuit court "properly grants a motion for judgment on the pleadings if, from the face of the pleadings, the moving party is entitled to a judgment as a matter of law." *Id*. This case presents issues concerning legislative power and interpretation of constitutional provisions. "Constitutional challenges are issues of law this Court reviews *de novo*." *Estate of Overbey v. Chad Franklin Nat'l Auto Sales North, LLC*, 361 S.W.3d 364, 372 (Mo. banc 2012).

## Constitutional Validity of HB 150

Appellants argue the circuit court erred in finding HB 150 enforceable and constitutionally enacted over the governor's veto because the senate was without authority to consider HB 150 during the September 2015 veto session. Appellants contend article III, section 32 reserves consideration of only those bills vetoed within five days of, or after, the regular legislative session's adjournment (hereinafter, "late vetoed

3

bills") during a September veto session. Hence, because HB 150 was vetoed prior to the last five days of the regular legislative session, Appellants argue the senate had to vote to override the governor's veto prior to the end of the regular legislative session for the veto to be valid. The state argues the senate acted well within its plenary power, and HB 150 was enacted validly because article III, section 32 contains no language that limits or prohibits the senate from taking this action.

"The legislature represents the plenary power of the people in our three-partite system and may do everything the people have not denied it the power to do in the constitution." *Thompson v. Comm. on Legislative Research*, 932 S.W.2d 392, 394 (Mo. banc 1996) (*superceded by statute as recognized in Brown v. Carnahan*, 370 S.W.3d 637, 648 (Mo. banc 2012)). Stated differently, the legislature has plenary power to enact legislation on any subject in the absence of a constitutional prohibition. *Brooks v. State*, 128 S.W.3d 844, 847 (Mo. banc 2004).

The parties do not dispute the legislature's plenary power to reconsider bills returned by the governor and its power to vote to override a gubernatorial veto. Rather, the parties dispute whether the senate had the power to override the governor's veto during the September 2015 veto session when the house voted to override the veto during the regular legislative session. This case presents an issue of first impression for this Court.

***Historical Examination of Article III, section 32***

"Constitutional provisions are subject to the same rules of construction as other laws, except that constitutional provisions are given a broader construction due to their

4

more permanent character." *Neske v. City of St. Louis*, 218 S.W.3d 417, 421 (Mo. banc 2007) (*overruled on other grounds by King-Willmann v. Webster Groves Sch. Dist.*, 361 S.W.3d 414 (Mo. banc 2012)). "In construing individual sections, the constitution must be read as a whole, considering other sections that may shed light on the provision in question." *State ex rel. Mathewson v. Bd. of Election Comm'rs of St. Louis Cnty.*, 841 S.W.2d 633, 635 (Mo. banc 1992). "This Court must assume that every word contained in a constitutional provision has effect, meaning, and is not mere surplusage." *State v. Honeycutt*, 421 S.W.3d 410, 415 (Mo. banc 2013). "Words used in constitutional provisions are interpreted to give effect to their plain, ordinary, and natural meaning." *Wright-Jones v. Nasheed*, 368 S.W.3d 157, 159 (Mo. banc 2012).

"Challenges to legislation based on constitutionally imposed procedural limitations are not favored." *Mo. Roundtable for Life, Inc. v. State*, 396 S.W.3d 348, 351 (Mo. banc 2013). However, if the act "clearly and undoubtedly violates the constitutional limitation," this Court will hold it unconstitutional. *Id*. (quoting *Hammerschmidt v. Boone County*, 877 S.W.2d 98, 102 (Mo. banc 1994)). "A constitutional provision should never be construed to work confusion and mischief unless no other reasonable construction is possible.'" *Am. Fed'n of Teachers v. Ledbetter*, 387 S.W.3d 360, 363-64 (Mo. banc 2012) (quoting *Theodoro v. Dep't of Liquor Control*, 527 S.W.2d 350, 353 (Mo. banc 1975)).

"One of the accepted canons of statutory construction permits and often requires an examination of the historical development of the legislation, including changes therein and related statutes." *State ex rel. Smith v. Atterbury*, 270 S.W.2d 399, 405 (Mo. banc

1954).  The legislative history of Article III, section 32 is instructive in resolving the issue presented here.

> Article III, section 32, as adopted in the Missouri Constitution of 1945, provided:
>
> Every bill presented to the governor and returned with his objections shall stand as reconsidered in the house to which it is returned.  The objections of the governor shall be entered upon the journal and the house shall proceed at its convenience to consider the question pending, which shall be in this form: 'Shall the bill pass, the objections of the governor thereto notwithstanding?'  The vote upon this question shall be taken by yeas and nays and if two-thirds of the elected members of the house vote in the affirmative the presiding officer of that house shall certify that fact on the roll, attesting the same by his signature, and send the bill with the objections of the governor to the other house, in which like proceedings shall be had in relation thereto.  The bill thus certified shall be deposited in the office of the secretary of state as an authentic act and shall become a law.

When the 1945 constitution was adopted, any bill vetoed by the governor at any time could be reconsidered by the legislature at its convenience.  Hence, the legislature was not restricted temporally in how it could proceed regarding any bill vetoed by the governor.

After the general election in November 1970, Missouri citizens voted to amend article III, section 32 to enact different veto procedures depending on when the bill was vetoed and the year in which the governor's veto occurred.  The amended language stated in pertinent part:

> If the governor returns any bill with his objections after the adjournment of the general assembly … in odd-numbered years, the bill shall be placed at the top of the calendar of the house to which it is returned for consideration when the general assembly reconvenes the following year.  If the governor returns any bill with his objection after the adjournment sine die of the general assembly on the ninetieth calendar day after its convening in even-numbered years, the general assembly shall automatically reconvene on the

6

first Wednesday following the first Monday in September of such even-numbered year for a period not to exceed ten calendar days for the sole purpose of considering bills returned by the governor.

Art. III, sec. 32 (1970). Thus, bills that were vetoed after adjournment in odd-numbered years would be placed upon the calendar of the house from which it was returned to be considered when the General Assembly reconvened the following calendar year. Bills that were vetoed after adjournment in even-numbered years prompted a subsequent September veto session. Notably, this amendment stripped the legislature of its power to reconsider bills at its convenience. This article retained the procedure for voting to override the governor's veto and the requirement that, after an initial vote, the bill must be sent to the other house for "like proceedings" to occur.

Two years later, at the 1972 general election, the people of Missouri again voted to amend article III, section 32 to change the procedure for the legislature to reconsider bills vetoed by the governor. The amendment provided:

> If the governor returns any bill with his objections on or after the fifth day before the last day upon which a session of the general assembly may consider bills in odd-numbered years, the bill shall be placed at the top of the calendar of the house to which it is returned for consideration when the general assembly reconvenes the following year. If the governor returns any bill with his objections on or after the fifth day before the last day upon which a session of the general assembly may consider bills in even-numbered years, the general assembly shall automatically reconvene on the first Wednesday following the first Monday in September of such even-numbered year for a period not to exceed ten calendar days for the sole purpose of considering bills returned by the governor.

Art. III, sec. 32 (1972). This amendment retained the odd-even-numbered year distinction for reconsideration of bills vetoed by the governor. However, the amendment expanded the window for reconsideration to include not only bills vetoed after

7

adjournment but also bills vetoed on or after the fifth day before the end of the regular legislative session. Again, this article retained the procedure for voting to override the veto and the requirement that, after an initial vote, the bill must be sent to the other house for "like proceedings" to occur.

Finally, article III, section 32 was amended after a general election in 1988. This version governs Appellants' claim and provides in full:

> Every bill presented to the governor and returned with his objections shall stand as reconsidered in the house to which it is returned. If the governor returns any bill with his objections on or after the fifth day before the last day upon which a session of the general assembly may consider bills, the general assembly shall automatically reconvene on the first Wednesday following the second Monday in September for a period not to exceed ten calendar days for the sole purpose of considering bills returned by the governor. The objections of the governor shall be entered upon the journal and the house shall proceed to consider the question pending, which shall be in this form: 'Shall the bill pass, the objections of the governor thereto notwithstanding?' The vote upon this question shall be taken by yeas and nays and if two-thirds of the elected members of the house vote in the affirmative the presiding officer of that house shall certify that fact on the roll, attesting the same by his signature, and send the bill with the objections of the governor to the other house, in which like proceedings shall be had in relation thereto. The bill thus certified shall be deposited in the office of the secretary of state as an authentic act and shall become a law.

Art. III, sec. 32 (1988). The most significant changes of the amendment, resulting in the current version of article III, section 32, were the elimination of the odd-even-numbered year distinction and the automatic convening of a September veto session each year after the governor vetoes bills on or after the fifth day before the last day of the regular legislative session.

8

*HB 150 is Unconstitutional*

Article III, section 32 has been amended multiple times since 1945. "The fundamental rule of constitutional construction is that courts must give effect to the intent of the people in adopting the amendment." *Barnes v. Bailey*, 706 S.W.2d 25, 28 (Mo. banc 1986). Amendments are presumed to have intended to effect some change in the existing law. *State ex rel. Registration for the Healing Arts v. Southworth*, 704 S.W.2d 219, 224-25 (Mo. banc 1986). This is because "[t]o amend a [provision] and accomplish nothing from the amendment would be a meaningless act." *State v. Liberty*, 370 S.W.3d 537, 561 (Mo. banc 2012). "[P]rovisions retained are regarded as a continuation of the former law, while those omitted are treated as repealed." *Jefferson ex rel. Jefferson v. Mo. Baptist Med. Ctr.*, 447 S.W.3d 701, 708-09 (Mo. App. E.D. 2014) (quoting *State ex rel. Klein v. Hughes*, 173 S.W.2d 877, 880 (Mo. 1943)).

The plain language of article III, section 32 demonstrates that a veto session is not triggered unless and until a bill is returned by the governor on or after the fifth day before the end of the regular legislative session. Thus, it is uncertain whether a veto session will actually take place unless and until the governor returns a bill on or after the fifth day before the end of the regular legislative session. Moreover, reconsideration contemplates a two-house process, wherein the house to which the bill is returned must vote to override the governor's veto and then send the bill to the other house for "like proceedings."

Here, the resolution of whether the senate could reconsider HB 150 after adjournment of the regular legislative session depends upon the purpose of the September veto session. Article III, section 32 provides that only if the governor returns any bill

9

with his objections on or after the fifth day before the end of the regular legislative session, then shall the September veto session be convened. That session will be convened "for the sole purpose of considering bills returned by the governor." The parties disagree about the meaning and scope of this phrase. Appellants argue the veto session can only address late-vetoed bills when reading the first two sentences of article III, section 32 together. The state argues that because article III, section 32 refers to "bills" — plural — the legislature is not limited to reconsidering only late-vetoed bills. The state maintains the legislature can consider any vetoed bill, regardless of when the veto occurred during that particular term of the General Assembly.

A close reading of the amendments to article III, section 32 since 1945 reveals clearly the people's intent to confine a September veto session to only late-vetoed bills. In 1945, the legislature could reconsider any bill vetoed by the governor, regardless of when the governor vetoed the bill, at its convenience. As the dissenting opinion concedes, this original section "made no mention of late-vetoed bills and did not prescribe a special procedure in the event that the governor returned a bill with objections after adjournment of the legislature." *Slip op. at 5*. Since then, in every subsequent amendment to article III, section 32, however, the people of Missouri gradually have restricted the legislature's power regarding which bills it can reconsider and when the reconsideration can occur. The subsequent amendments enacted by the people of Missouri have made a clear distinction between "every bill" returned by the governor and late-vetoed bills. This Court must presume these amendments have meaning and were intended to define the scope of the September veto session.

10

All of the subsequent amendments to article III, section 32 were enacted to protect the General Assembly's right to override the governor on late vetoed bills. When a bill is vetoed more than five days before the end of the regular legislative session, the General Assembly has adequate time to reconsider a vetoed bill or reintroduce the same or similar bill for consideration and adoption. Late-vetoed bills put the legislature at a disadvantage when the governor returns a bill at or near adjournment because there is little, if any, time to reconsider the veto after adjournment.[1] Hence, when construing the first two sentences of article III, section 32 together, this Court finds that the veto session's purpose is to consider those bills — plural — that brought the session into existence, namely late-vetoed bills.[2]

If the veto session's scope is not confined to late-vetoed bills, as urged by the state and the dissenting opinion, then the legislature could ostensibly address any vetoed bills during the General Assembly's entire session or during the governor's term in office, which could span several years. Not only does this construction render the limitation of "on or after the fifth day" before the end of the regular legislative session meaningless, it also leads to an absurd result. *See Humane Soc'y of U.S. v. State*, 405 S.W.3d 532, 537

---

[1] The dissenting opinion questions why the objective of the September veto session could not include reconsideration of bills that were not vetoed late. This interpretation renders the phrase "on or after the fifth day" superfluous, which is contrary to this Court's requirement that it must give meaning to every word and assume that any constitutional amendment was intended to effect a change in the law.

[2] The likelihood that the governor could veto multiple bills on or after the fifth day before the end of the legislative session, thereby resulting in reconsideration of multiple bill*s* — plural — belies the dissenting opinion's alleged confusion as to why the legislature would require a ten-day veto session to reconsider late-vetoed bills.

11

(Mo. banc 2013) (finding that a constitutional interpretation producing an absurd result is unreasonable).

The absurdity is further demonstrated by the dissenting opinion's reliance on the language that all vetoed bills must be reconsidered by "the house to which it is returned" as providing an "implicit temporal limitation on the reconsideration of vetoed bills due to the manner in which the houses of the General Assembly are formed." *Slip op. at 8*. Not only does the dissenting opinion read a limitation into the text that is not stated, the dissenting opinion presumes that every election cycle will result in future houses of the General Assembly being composed of different members. The dissenting opinion posits that a future General Assembly could not validly override the veto to a bill originally passed by the houses of a previous General Assembly. However, the dissenting opinion makes no room for the possibility, albeit unlikely, that each member seeking election retains his or her seat in the General Assembly. Thus, and in that instance, there is no implicit temporal limitation that would preclude the next session of the General Assembly, comprised of identical members, from taking up unfinished business from the previous session under the dissenting opinion's interpretation of article III, section 32. While this example is somewhat implausible, the dissenting opinion also raises the specter of reconsideration of vetoed bills left unaddressed during the first session of the General Assembly and held out until the second session begins. The dissenting opinion recognizes that previous versions of article III, section 32 explicitly contemplated such carry over; however, it is clear that the current version of article III, section 32 does not provide such a power. The dissenting opinion's rationale is *ultra vires*.

It should be noted that neither the parties nor the dissenting opinion can point to any single, prior instance in which the legislature had endeavored to override the governor's veto in such a way as occurred here, despite both arguing article III, section 32 provides the legislature such clear-cut plenary power. Were this Court to adopt the dissenting opinion's interpretation, it would encourage the legislature to engage in gamesmanship, delay, and dilatory conduct that would harm the people of Missouri by failing to enact legislation in a timely manner. Of note, the people of Missouri who would be harmed are those true Missourians who amended the constitution in 1945, 1970, 1972, and 1988 to structure and assist the legislature in reconsideration of vetoed bills. The people of Missouri are entitled to the efficient, orderly conduct of legislative business during the General Assembly's session.

There is no dispute that HB 150 was not a late-vetoed bill. The house sent HB 150 to the senate for reconsideration two days before the end of the regular legislative session. The senate's failure to act on HB 150 before the end of the regular legislative session resulted in HB 150 being tabled pursuant to article III, section 20(a). Accordingly, the senate lacked authority to reconsider HB 150 during the September 2015 veto session.[3] The senate's override of the governor's veto of HB 150 was untimely, causing HB 150 not to be passed "the objections of the governor thereto

---

[3] Because this Court holds that only late-vetoed bills can be reconsidered during a September veto session, this Court need not address the issues of whether the senate had authority to act alone during the September 2015 veto session and whether the regular legislative session and the September 2015 session are considered "like proceedings" as contemplated by article III, section 32.

notwithstanding." Because HB 150 was not passed over the governor's veto, none of its provisions became law.

## Conclusion

The circuit court's judgment is reversed.

      _____
      GEORGE W. DRAPER III, JUDGE


Stith, Wilson and Teitelman, JJ., concur; Russell, J., dissents in separate opinion filed; Breckenridge, C.J., and Fischer, J., concur in opinion of Russell, J.



# SUPREME COURT OF MISSOURI
# en banc

TIMOTHY S. PESTKA et al.,          )
                                          )
            Appellants,              )
                                          )
v.                                           )       No. SC95369
                                          )
The STATE OF MISSOURI, et al.,        )
                                          )
            Respondents.           )

## DISSENTING OPINION

### A. Introduction

I respectfully dissent. HB 150 is valid and enforceable because the General Assembly followed the procedures required by the Missouri Constitution for passing a bill over the governor's objections. To reach its result invalidating the substantive provisions of the bill, the majority opinion reads into the text of article III, section 32 of the Missouri Constitution limitations on the plenary power of the legislature that do not appear in the plain language of the section. This reading departs from settled precedent of this Court construing constitutional provisions in favor of the plenary power of the legislature and upholding legislative acts unless they clearly and undoubtedly violate

constitutional limitations.  No such showing has been made here.  The judgment of the circuit court should be affirmed.

**B. The General Assembly has the power to override a veto of any bill during the veto session created by article III, section 32 of the Missouri Constitution**

   *1. When the constitution imposes no explicit limitations on the legislature, the General Assembly has plenary power to carry out its legislative duties*

Appellants argue, and the majority opinion agrees, that article III, section 32 constitutes a procedural limitation on the power of the General Assembly to override a veto.  A constitutional limitation, however, must be strictly construed by this Court in favor of the plenary power of the legislature.  *Bd. Of Educ. Of City of St. Louis v. City of St. Louis*, 879 S.W.2d 530, 533 (Mo. banc 1994). This Court has repeatedly recognized the plenary power of the General Assembly to "make, amend and repeal laws for Missouri."  *State Auditor v. Joint Comm. on Legislative Research*, 956 S.W.2d 228, 230-31 (Mo. banc 1997).  The legislature has "the power to do whatever is necessary to perform its functions except as expressly restrained by the Constitution."  *Liberty Oil Co. v. Dir. of Revenue*, 813 S.W.2d 296, 297 (Mo. banc 1991).

   In recognition of the legislature's plenary power, attacks against legislative action based on constitutionally imposed procedural limitations are not favored.  *Hammerschmidt v. Boone Cnty.*, 877 S.W.2d 98, 102 (Mo. banc 1994).  This Court will uphold a statute against such an attack unless the act clearly and undoubtedly violates the constitutional limitation.  *Brown v. Morris*, 290 S.W.2d 160, 167 (Mo. banc 1956).  Any doubt as to the validity of a legislative action should be resolved in favor of the action

2

taken if it is possible to do so by any reasonable construction of the constitution. *Liberty Oil Co.*, 813 S.W.2d at 297.

To conclude that HB 150 is unenforceable due to the procedure followed by the legislature in overriding the governor's veto, the majority opinion was required to find that (1) the Constitution expressly restrained the General Assembly from acting as it did and (2) no reasonable construction of the constitution supported the validity of the legislature's actions. As discussed below, no such finding has been made here.

> 2. *The plain language of article III, section 32 permits the legislature to reconsider any vetoed bills during its veto session*

The provisions of article III, section 32 create a veto session automatically when certain conditions are met. The veto session is triggered "[i]f the governor returns *any bill* with his objections" on or after the fifth day before the end of the regular session. MO. CONST. art. III, sec. 32 (emphasis added). Once a late vetoed bill triggers the veto session, the legislature reconvenes for a period of not more than ten days "for the sole purpose of considering *bills* returned by the governor." *Id.* (emphasis added).

Words used in constitutional provisions must be given their plain, ordinary, and natural meaning. *Wright-Jones v. Nasheed*, 368 S.W.3d 157, 159 (Mo. banc 2012). According to the plain language of article III, section 32, a single bill that is vetoed after a certain point in the regular session gives rise to the automatic ten day veto session. After the veto session is triggered, the General Assembly may reconsider "bills" returned by the governor. The use of the plural word "bills" is significant here. While it only takes a single late vetoed bill to trigger the veto session, article III, section 32 does not

3

limit the legislature to considering only that late vetoed bill during the veto session.[1]  Nor

does the provision contain any language explicitly limiting the legislature to considering

only other late vetoed bills that would have been capable of activating the veto session.

Instead, a natural reading of "bills returned by the governor" includes all vetoed bills, not

just those that were vetoed late in the session.

    3.  *The history of article III, section 32 supports the conclusion that it does not prohibit the legislature from considering early vetoed bills during the veto session*

Appellants' argument that the phrase "bills returned by the governor" should be

interpreted to include only late vetoed bills not only misconstrues and distorts the plain

language of the provision, but it also fails to find support from the historical development

of article III, section 32.  *See State ex rel. Smith v. Atterbury*, 270 S.W.2d 399, 405 (Mo.

banc 1954) (noting that one of the canons of constitutional construction permits or even

requires an examination of the historical development of a provision).

Article III, section 32 was first added to the state constitution in 1945 and

provided that the legislature could reconsider any vetoed bill "at its convenience."  MO.

CONST. art. III, sec. 32 (1945).  It was then amended in 1970 and 1972 to create separate

procedures for reconsidering vetoed bills depending on the year of the legislative session.

Under the 1970 and 1972 versions of article III, section 32, if the governor vetoed "*any*

*bill*" "late"[2] in an odd-numbered year (when the same General Assembly would return for

---

[1] Indeed, one might reasonably wonder why the legislature would need a ten day veto session if it was only allowed to reconsider a single vetoed bill during that time.
[2] The primary difference in the 1970 and 1972 amendments is how they defined a late vetoed bill.  A bill was vetoed late under the 1970 amendment if it was vetoed after

4

its second session the following year), then "*the bill*" – singular – would be placed "at the top of the calendar of the house to which it is returned for consideration when the General Assembly reconvenes the following year." (emphasis added). If the governor vetoed a bill late during an even-numbered year (when elections would be held and a new General Assembly would convene the following year), the 1970 and 1972 versions of article III, section 32 provided that the General Assembly would automatically reconvene for a period not more than ten days to reconsider "*bills*" – plural – returned by the governor. (emphasis added).

The original version of article III, section 32 made no mention of late vetoed bills and did not prescribe a special procedure in the event that the governor returned a bill with objections after adjournment of the legislature.[3] The 1970 and 1972 amendments

---

adjournment of the regular session. MO. CONST. art. III, sec. 32 (1970). In 1972, voters adopted the definition of late vetoed bills found in the current version of the constitutional provision. MO. CONST. art. III, sec. 32.

[3] The majority opinion focuses its historical analysis of article III, section 32 on the removal of language allowing the legislature to reconsider a vetoed bill "at its convenience," concluding that the deletion of such language initiated a gradual restriction of the legislature's power to reconsider vetoed bills. Slip op. at 10. Not so. The 1970 and 1972 amendments demonstrate a concern for the legislature's opportunity to reconsider a bill vetoed late in the regular session or after adjournment, not an intention to restrict that power. While the original provision's language allowing the house to reconsider a vetoed bill "at its convenience" may seem expansive, the two-year election cycle for members of the legislature would make review of certain late vetoed bills extremely difficult under the original text of article III, section 32. For instance, a bill vetoed after the adjournment of the second regular session of a General Assembly could not be reconsidered by the same house in which the bill originated unless the legislature called its own special session by a three-fourths vote of the members of both houses. Otherwise, elections would take place in November following the second regular session, and a new General Assembly would convene for its first regular session the following year. Because article III, section 32 required the bill to be reconsidered by "the house to which it is returned," the new General Assembly composed of different legislative

5

addressed that concern directly by creating procedures to ensure that the General Assembly had the opportunity to reconsider late vetoed bills. Further, those amendments demonstrate that voters knew how to limit which vetoed bills the legislature could reconsider after its regular session ended, but that they chose not to do so under the current text of article III, section 32. Had voters wanted to limit the legislature to considering only late vetoed bills during the veto session, they needed only to follow or imitate the language previously applicable to odd-numbered years, which explicitly limited the legislature to considering "the bill" subject to a late veto during the next regular session. Instead, voters retained the more expansive language that was reserved for even-numbered years in the previous amendments to the section, which allows the General Assembly to reconsider "bills" vetoed by the governor when "any bill" is returned late and triggers the veto session.

> 4. *When read in context, article III, section 32 is best interpreted as protecting the legislature's power to override a veto, not limiting it*

Surrounding provisions of the constitution further emphasize that article III, section 32 is not a limitation of the power of the legislature to reconsider vetoed bills, as Appellants and the majority opinion argue. The provision, instead, protects and enlarges that power. Article III, section 32 is included in the "Legislative Proceedings" subheading of that article. Other sections included in that grouping do impose limitations on the proceedings of the legislature. Each of those provisions contains language clearly

---

members could not reconsider the vetoed bill. MO. CONST. art. III, sec. 32 (1945). The 1970 and 1972 amendments resolved that issue by setting out explicit procedures for reconsidering late vetoed bills.

6

and unequivocally limiting legislative or executive action, and the limitations imposed appear expressly both in the title and text of each section.[4] Article III, section 32, which is titled "Vetoed bills reconsidered, when," is devoid of such explicitly limiting language. Instead, it provides that vetoed bills "stand as reconsidered" in the house to which they are returned without any action by the legislature, and it creates a veto session for the legislature to reconsider vetoed "bills," again, without any further action on the part of the legislature. These provisions make no express attempt to limit legislative action but simply make it easier for the legislature to reconsider vetoed bills. In context, article III, section 32 is more appropriately read as a protection of the legislature's power to override the governor's veto, not a limitation on that power.

> 5. *Allowing the legislature to reconsider any vetoed bill during the automatic veto session does not lead to an absurd result*

The majority opinion asserts, "If the veto session's scope is not confined to late vetoed bills…then the legislature could ostensibly address any vetoed bills during the General Assembly's entire session or during the governor's term in office," which, it argues, would be an absurd result. Slip op. at 10-11. The concern that the legislature

---

[4] For instance, article III, section 21 titled "Style of Laws—Bills—Limitation on Amendments—Power of Each House to Originate and Amend Bills—Reading Bills" states, "No law shall be passed except by bill, and no bill shall be so amended in its passage through either house as to change its original purpose." Article III, section 23, titled "Limitation of Scope of Bills—Contents of Title—Exceptions," provides, "No bill shall contain more than one subject which shall be clearly expressed in its title." Article III, section 25 is titled "Limitation on Introduction of Bills" and states, "No bill other than an appropriation bill shall be introduced in either house after the sixtieth legislative day." Article III, section 31 includes the denomination "Time Limitations" in its title and provides that within 15 days after presentment, the governor "shall return [a bill that has passed both houses] to the house in which it originated endorsed with his approval or accompanied by his objections."

7

could reconsider any bill that had been vetoed by the governor, even if the bill was vetoed years earlier, is unfounded because the text of article III, section 32 states that vetoed bills must be reconsidered by "the house to which it is returned." This language imposes an implicit temporal limitation on the reconsideration of vetoed bills due to the manner in which the houses of the General Assembly are formed. In all even-numbered years, elections are held for representative seats in both houses. Consequently, in the odd-numbered years, a new General Assembly convenes. Because the house to which a bill is returned must reconsider the bill, future houses of the General Assembly, composed of different legislative members, could not validly override the veto to a bill originally passed by the houses of a previous General Assembly.[5] Further, the majority opinion gives no explanation as to why it would be absurd for the General Assembly to reconsider a bill vetoed early in the regular session during a veto session held later the same year.[6]

---

[5] Whether a vetoed bill passed during the first session of the General Assembly could be reconsidered during the second session of the same General Assembly, or during the veto session following the second regular session, is a more nuanced question. While the text of the current version of article III, section 32 does not seem to prohibit such action, previous versions of the provision explicitly contemplated such carryover from the first to the second regular session. MO. CONST. art. III, sec. 32 (1970); MO. CONST. art. III, sec. 32 (1972). The removal of this language may indicate that voters did not intend for the legislature to be able to reconsider vetoed bills in a subsequent year of the same General Assembly.

[6] As the majority opinion notes, the primary objective of the automatic veto session is to give the legislature time to reconsider bills that were vetoed so late that it might not otherwise have had a meaningful opportunity to reconsider them. What the majority opinion fails to explain, however, is why that objective precludes a finding that the legislature could also reconsider bills that were not vetoed late once the veto session is triggered, which the plain language of article III, section 32 would seemingly permit.

Without reading in language that simply does not appear in its text, article III, section 32 does not prevent the General Assembly from reconsidering any vetoed bills that were passed in its regular session during a subsequent veto session. Appellants' attempt to impose conjectured or implied limitations on the General Assembly's veto override process in this regard is unfounded in the plain language, history, and context of article III, section 32. It further fails to account for the legislature's plenary power to carry out its law-making functions. Adopting the urged interpretation is a deviation from this Court's settled precedent, which requires the Court to strictly construe constitutional limitations in favor of the legislature's plenary power and to uphold legislative action as long as a reasonable interpretation of the constitution supports it. *Bd. Of Educ. Of City of St. Louis*, 879 S.W.2d at 533; *Liberty Oil Co.*, 813 S.W.2d at 297. This Court should find that the General Assembly's act of overriding the governor's veto to HB 150 during the 2015 veto session is constitutionally valid.

## C. The General Assembly's override of the veto to HB 150 was valid even though the House of Representatives voted to override the veto prior to the May 2015 adjournment of its regular session and the Senate did so in the subsequent veto session

Concluding that the legislature may reconsider all vetoed bills during a veto session, once triggered, does not end the inquiry in this case. The override of HB 150 was also anomalous because the House of Representatives voted to override the governor's veto prior to adjournment[7] of its regular session, but the Senate did not act to

_____

[7]Although the General Assembly may debate bills through "the first Friday following the second Monday in May" before they are automatically tabled, it is the constitutionally mandated adjournment date found in article III, section 20(a) that is referenced in this

9

override the veto until it reconvened for the September 2015 veto session. Consequently, the second issue presented here is whether the General Assembly could validly override a veto when one of the houses voted on the vetoed bill prior to adjournment and the other house acted on the bill after adjournment in the veto session.

The majority opinion agrees with Appellants' argument that the houses could not act to override the veto in what they characterize as two different sessions. This argument starts with the premise that a regular session of the General Assembly and the subsequent veto session are actually different sessions. That premise is incorrect. The journals for the House of Representatives and the Senate show that the veto session is an extension of the regular session it follows. For example, the journals for September 16, 2015, for both houses indicate that it was the first day of the veto session of the *first regular session of the 98th General Assembly, which convened on January 07, 2015.*[8] In addition, article III, section 32 provides that a session of the General Assembly shall "reconvene" to reconsider vetoed bills if any bill is vetoed late. As a result, the General Assembly does act on a vetoed bill in the *same session* even when one house votes to override the veto before adjournment of the regular session and the other house does so during the subsequent veto session.

### D. Response to the majority opinion: HB 150 was not tabled at the end of the 2015 regular session

---

opinion. MO. CONS. art. III, sec. 20(a). This provision requires the General Assembly to adjourn at midnight on May 30 unless it has already adjourned prior to that date. *Id.*
[8]JOURNAL OF THE SENATE, 98th Gen. Assemb., 1st Reg. Sess., at 1, *available at* http://www.senate.mo.gov/15info/Journals/VDay0109161-26.pdf#toolbar=1; JOURNAL OF THE HOUSE, 98th Gen. Assemb., 1st Reg. Sess., at 1, *available at* http://www.house.mo.gov/billtracking/bills151/jrnpdf/jrn001.pdf.

10

The majority opinion summarily states, without explanation, "The senate's failure to act on HB 150 before the end of the regular legislative session resulted in HB 150 being tabled pursuant to article III, section 20(a)." Slip op. at 11. This unsupported conclusion, which appears to stem from Appellants' argument that vetoed bills are irrevocably tabled by the provisions of article III, section 20(a), is misplaced. That section provides that "[a]ll bills in either house remaining on the calendar" after adjournment of the General Assembly's regular session "are tabled." MO. CONST. art. III, sec. 20(a). Although Appellants acknowledge that article III, section 32 may, in their words, create an "exception" to the tabling provision of article III, section 20(a), they insist that HB 150 was not subject to that exception because it was vetoed early in the session. They point out that the Senate never voted to remove HB 150 from the table before voting to pass the bill over the governor's veto,[9] and, furthermore, that the Senate could not validly have done so because it was constitutionally limited to reconsidering only late vetoed bills at its veto session.

Appellants' argument first assumes that vetoed bills are required to be placed on a calendar. This assumption is not founded in the text of the constitution. Again, Appellants are attempting to place limitations on the plenary power of the legislature that do not appear in the plain language of the constitution. *Bd. Of Educ. Of City of St. Louis*, 879 S.W.2d at 533 (constitutional limitations must be strictly construed in favor of the plenary power of the legislature). Article III, section 32 does not require the legislature

_____

[9] Senate Rule 75 provides that bills can be removed from the table with a vote of two-thirds of its members.

11

to place a vetoed bill on any calendar. Instead, the provision describes a vetoed bill as "standing as reconsidered" and requires only that the governor's objections to the bill be entered on the journal before the house can vote on the "pending" question of whether the bill should pass over the governor's veto.

Once again, a review of the history of article III, section 32 demonstrates that, as currently written, this provision does not require that a vetoed bill be placed on a calendar. The 1970 and 1972 versions of this provision both explicitly mandated a late vetoed bill from an odd-numbered year to be "*placed at the top of the calendar* of the house to which it is returned for consideration when the General Assembly reconvenes the following year." MO. CONST. art. III, sec. 32 (1970) (emphasis added); MO. CONST. art. III, sec. 32 (1972) (emphasis added). On the other hand, the section never required late vetoed bills to be placed on any calendar in even-numbered years, but instead provided that the General Assembly would "automatically reconvene" to consider "bills returned by the governor" at the veto session later the same year. MO. CONST. art. III, sec. 32 (1970); MO. CONST. art. III, sec. 32 (1972).

When the current version of article III, section 32 was adopted in 1988, voters retained the language regarding veto sessions previously applicable in even-numbered years and removed the provisions that had applied to odd-numbered years, including the requirement that a bill vetoed late in such a year be placed on the calendar for the next year's session. MO. CONST. art. III, sec. 32 (1988). The removal of explicit language requiring vetoed bills to be placed on a calendar is a strong indication that voters did not

12

intend to impose such a requirement on the legislature under the terms of the current constitution.

Because vetoed bills are not required to be placed on the calendar by article III, section 32 or any other provision of the Missouri Constitution, they are not "bills remaining on the calendar" as contemplated by article III, section 20(a). Neither are they tabled automatically at the end of the regular session by that provision.[10] The Senate could – and did – validly call HB 150 up for a veto override vote without taking any steps to remove it from the table.

Even under Appellants' argument that all bills, including vetoed bills, must be placed on a calendar, and, thus, are potentially subject to tabling under article III, section 20(a), the Senate's actions with regard to HB 150 would still be proper. Appellants concede that article III, section 32 creates an exception to the tabling requirement of article III, section 20(a) by allowing the legislature to consider vetoed bills during the veto session without removing those bills from the table. But they argue that this exception applies only to late vetoed bills because article III, section 32 restricts the legislature to considering only those bills during its veto session. As discussed above, the

_____

[10] The customary practice of the General Assembly supports this finding. The General Assembly does not vote to remove a vetoed bill from the table before reconsidering it during the veto session, nor does it appear that the houses consistently place vetoed bills on their formal calendars before taking them up for a vote. For instance, HB 150 never appeared on the Senate's calendar as a vetoed bill. Similarly, SB 509, which was truly agreed to and finally passed during the 2014 regular session, was vetoed by the governor on May 1, 2014. The Senate voted to override the veto on May 5, 2014, but SB 509 did not appear on the Senate calendar before the Senate voted to override the veto. JOURNAL OF THE SENATE, 97th Gen. Assemb., 2nd Reg. Sess., at 1255-259, *available at* http://www.senate.mo.gov/14info/Journals/RDay6205051250-1287.pdf#toolbar=1.

plain language of the section contains no such limitation and permits the legislature to reconsider any "bills returned by the governor" during its veto session. Consequently, article III, section 32 prevents all "bills" vetoed by the governor from being tabled at the end of the regular session. For the legislature to reconsider any vetoed bill either before or after adjournment of the same regular session, the legislature need only follow the procedures listed in article III, section 32, and those procedures do not include removing the bill from the table.

### E. Conclusion

The Senate's proceedings with regard to HB 150 complied with the requirements that appear in the plain text of article III, section 32. No other limitation or restriction on the legislature's plenary power should be appended to the provision, as doing so contradicts the plain language, history, and contextual meaning of the section and departs from established precedent of this Court holding that the General Assembly has "the power to do whatever is necessary to perform its functions except as *expressly restrained* by the Constitution." *Liberty Oil Co.*, 813 S.W.2d at 297 (emphasis added). The Senate's actions here were valid because, except for the express requirements of the Constitution, the Senate has constitutional authority to determine the rules of its own proceedings. MO. CONST. art. III, sec. 18. It is not in the province of this Court to trespass on that authority. *Progress Missouri, Inc. v. Missouri Senate*, ___ S.W.3d ___ (Mo. App. 2016). The decision of the circuit court should be affirmed.

_____
Mary R. Russell, Judge

14